The UNITED STATES, Appellant,

v.

ROSES INCORPORATED, Appellee.

Appeal No. 82–27.

United States Court of Appeals, Federal Circuit.

April 25, 1983.

Jack R. Miller, Circuit Judge, filed opinion dissenting in part.

Sheila N. Ziff, of Washington, D.C., argued for the United States. With her on the brief were J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director and Velta A. Melnbrencis, New York City.

Eugene L. Stewart, Washington, D.C., argued for appellee. With him on the brief was Terence P. Stewart and Paul W. Jameson, Washington, D.C., of counsel.

Before NICHOLS, MILLER and SMITH, Circuit Judges.

NICHOLS, Circuit Judge.

This is an appeal by the United States from an order of the Court of International Trade (CIT) requiring the Department of Commerce to initiate an antidumping investigation, despite its prior refusal to do so. We agree with the CIT that the administrative proceedings are tainted by serious illegality, but disagree as to the remedy selected. We remand to the CIT for further proceedings in conformity with this opinion, 538 F.Supp. 418.

## I—History of the case

Roses Incorporated is a trade association of domestic rose growers and is accepted as having standing to petition, as it has, for assessment of antidumping duties against the importation of fresh cut roses from Columbia, South America. It filed its original petition with the Commerce Department on June 4, 1981, pursuant to 19 U.S.C. § 1673a(b)(1) (Supp. V 1981). That Department gave the matter immediate attention, being aware that by 19 U.S.C. § 1673a(c) it had but 20 days to decide what to do. It notified appellee's counsel that the petition was defective in its view, and he filed additional data on June 19, 1981. Meanwhile, an association of Columbian rose growers (Asocoflores) learned of the filing and advised the Commerce Department it was seeking disclosure of appellee's confidential data under the Freedom of Information Act, 5 U.S.C. § 552 (1976). Additionally, the Commerce Department received letters from the Columbian Embassy and from Asocoflores containing data that traversed appellee's in some respects. On June 22, 1981, the International Trade Administration (ITA or agency), the arm of Commerce responsible in the premises, conducted an *ex parte* meeting with the Economic Minister of the Columbian Embassy, counsel for Asocoflores and others. The petition was discussed and objections to it noted. A study

by PROEXPO, a Columbian body, was discussed but not then filed. On June 24, 1981, the ITA notified counsel for appellee to withdraw the petition the next day or it would be dismissed, but he could submit another petition if he wished. On June 25, 1981, it was dismissed, with proper notice in the Federal Register. The dismissal was on other grounds than those urged by outside objectors.

On July 13, 1981, appellee, instead of filing another petition, sued in the CIT. It prayed for a declaratory judgment that the agency negative determination was unlawful, an order to the agency to institute an investigation forthwith, and such other relief as the court might decree proper.

Under date of April 28, 1982, the CIT held that the ITA proceedings were illegal, on the ground that the Columbian government and exporters should not have been allowed to submit information or otherwise participate in evaluation of the petition. Upon "perusal" of the original petition of June 4, 1981, the court determined that it, with its supporting data, contained allegations making mandatory the commencement of the next or investigatory stage of an antidumping proceeding. Accordingly, the court ordered that the petition be reinstated and the investigation be commenced. This appeal by the government followed.

## II—*Statutes Applicable*

This case derives much of its interest from the relative novelty of the statutes to be construed.

The jurisdiction of the CIT to review the decision of the ITA not to investigate as aforesaid, derives from 19 U.S.C. § 1516a (Supp. V 1981), and from 28 U.S.C. § 1582 (Supp. V 1981). Its authority to act upon its conclusions, in an appropriate case by ordering institution of an antidumping investigation, does not seem to be challenged—the issue being whether this is an appropriate case.

The manner of initiating an antidumping investigation, and the legal consequence of doing so, are completely recast in this legislation. The legal effect of a decision to conduct such an investigation is stated in 19 U.S.C. § 1673b, and does not include suspension of liquidation, except to a limited extent in stated "critical circumstances," until affirmative preliminary determinations are made as to a reasonable indication of injury to a domestic industry and a reasonable basis to suspect sales at less than fair value. These provisions were enacted as part of the Trade Agreements Act of 1979, Pub.L. No. 96–39, which repealed the former antidumping law.

In general, by § 1673a, the "administering authority" shall commence an investigation whenever it—

> determines, from information available to it, that a formal investigation is warranted * * *.

or whenever an "interested party"—

> files a petition with the administering authority, on behalf of an industry which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting these allegations. * * *

The administering authority "[w]ithin 20 days after the date on which a petition is filed" shall—

> *  *  *  *  *  *
>
> (1) determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations,
>
> (2) if the determination is affirmative, commence an investigation * * *.
>
> (3) if the determination is negative, dismiss the petition * * *.

Accordingly, an antidumping investigation must be commenced if the administering authority determines, *sua sponte*, that commencement is warranted, or if it determines that a petition, duly filed, alleges the elements necessary for relief supported by information reasonably available to the petitioner. Unlike previous practice, a petition may not be refused for filing on the

grounds that the information contained is not sufficient to allege dumping. Rather, the petition must be accepted for filing and then the authority must determine within 20 days whether to initiate an investigation.

### III—OPINION

#### A

■ The first question we must decide is whether, as the CIT thought, the mere receipt of oral or written material from persons representing the anticipated targets of the investigation, or their diplomatic representatives, during the 20 days following the filing of the petition, taints a decision to dismiss with illegality even though the dismissal is based, as here, on other grounds than those urged by the said targets, at least ostensibly. One's possible first impulse to hold the error was no worse than harmless is replaced on study of the statutory scheme by an appreciation that the CIT judge was right in attaching to the transaction the significance that he did.

In the first place, he quotes some very telling legislative history, and we can do no better than to quote it also. It is a colloquy between Senator Ribicoff, Chairman of the Subcommittee on International Trade of the Committee on Finance and floor manager of the bill, and Senator Danforth, co-sponsor of the legislation, explaining the bill on the Senate floor. 125 Cong.Rec. 20172 (1979):

Mr. Danforth. Should not the administering authority, like the courts, look only to the four corners of the petition—the pleading—and the information filed supporting the allegations and not elsewhere?

Mr. Ribicoff. Definitely yes.

Mr. Danforth. Since, at this stage, it is not the intent of Congress to have ongoing an advocacy proceeding, petitions or information seeking to rebut the allegations should not be considered by the administering authority, is this not correct?

Mr. Ribicoff. That is correct. This is not to say, however, that the administer-ing authority, like a court, may not take "judicial notice" of facts within the public domain.

Mr. Danforth. How much supporting information should be required of the petition?

Mr. Ribicoff. It is the intent of this legislation that the determination as to the information reasonably available to any petitioner be made in light of the circumstances of each petitioner.

Mr. Danforth. Should the "reasonably available" information requirement be the basis for the administering authority refusing to proceed with an investigation?

Mr. Ribicoff. No.

It is plainly implicit in the statutory language already quoted that a decision to dismiss a petition without any investigation will not be based on information from anticipated targets. In a spontaneously generated decision to investigate, the administering authority is to consider all information "available to it" which of course the target would always be happy to add to. The investigation then is to be made only if "warranted." Doubtless it would be an abuse to start an unwarranted investigation in such circumstances. But when there is a petition sufficient on its face, and as checked against other "facts within the public domain," even if investigation would appear unwarranted to one who knew all the facts, surely the investigation must still be commenced. How long it need be continued under such circumstances, we do not consider. This is the statutory scheme and appellant does not contend otherwise. Its carefully phrased brief urges no more than that the information from the targets could have been and presumably was received for consideration and possible use only after the investigation was under way.

Second, appellant invokes the presumption of governmental good faith. *Kalvar Corp. v. United States,* 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (Ct.Cl.1976). This is a decision of a predecessor court binding on us.

■ However, there is no issue of good faith in this case. It is unchallenged that

everyone concerned has acted in good faith, trying to accommodate to a new law which imposes new rights and new duties. What appellant is really talking about is the presumption of regularity of government action, a related but different presumption. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). Appellant says the presumption supports its assertion that the government officers did not consider the evidence they illegitimately obtained on June 22, 1981, because the law says they should not. It is really a presumption that what appears regular is regular, the burden being upon the attacker to show the contrary. It does not help to sustain an action that on its face appears irregular as here. We would say, here the presumption operates in reverse. If it appears irregular, it is irregular, and the burden shifts to the proponent to show the contrary. Here the CIT judge was clearly not impressed that the appearance of irregularity had been rebutted, nor are we.

Third, the receipt of material during the 20 days, from the anticipated target, frustrates the intended statutory scheme, even if the undisclosed intention of the authority is to ignore it until an investigation has commenced. On the one hand, if the statutory scheme is observed in appearance as well as reality, whether the investigation would appear warranted if all the facts were known, rests primarily on the veracity of the petitioner. That of the agency is not involved. We do not say, as the dissent imputes to us in a footnote, that the agency must determine if there is a reasonable basis to believe or suspect that merchandise is being dumped before an investigation is initiated. We say the contrary. If in the end the investigation proves to have been unwarranted, the reputation of the agency is not impugned. On the other hand, if the conscience of Asocoflores is clear, it can explain the initiation of the investigation to its customers as an event of no legal significance. Liquidation of duties will continue at the old rate with no addition for a dump-

ing margin until affirmative preliminary determinations are made, as previously noted. It is not harmed in the eyes of its customers, who, it would appear, would have been used to dumping complaints by appellee, which had got nowhere previously, so far as our record goes. But if Asocoflores goes in and resists the mere initiation of the investigation, and it is still initiated, it will appear that Asocoflores has already lost the case. This is not at all the appearance Congress wanted. It is not giving the statute a chance. Therefore, we do not think it would put the agency in conformity with the statute if it persuaded the CIT that it received material from the targets with no intention of giving it the slightest consideration until after commencing an investigation.

Fourth, appellant attempts to find congressional approval of its action in 19 U.S.C. § 1677f(3) reading—

> *Ex parte meetings.* The administering authority and the Commission shall maintain a record of ex parte meetings between—
>
> (A) interested parties or other persons providing factual information in connection with an investigation, and
>
> (B) the person charged with making the determination, and any person charged with making a final recommendation to that person, in connection with that investigation.

Dumping investigations do not include and never have included due process adversary hearings, but always have included *ex parte* meetings separately with the contenders. Obviously there is no intent in the Trade Agreements Act of 1979 to change this. Congress was concerned with providing interested parties with maximum access to information presented, and the requirement of recording *ex parte* meetings is one statutory provision reflecting this concern. But the language simply does not speak to the timing of what, done at the right time, would be a perfectly proper thing to do, provided a record was kept as Congress required. Appellee has an elaborate, but in our view, needless, argument to support

this self-evident conclusion. Suffice to say that this provision, in view of the entire statutory scheme, does not persuade us that Congress sanctioned *ex parte* meetings with targets during the 20-day period of petition review.

Finally, appellant urges the sensitivity of dumping investigations and the need to conduct them in a manner to minimize the damage they could cause to our relations with friendly foreign countries. We are sure Congress was not indifferent to this factor, though appellant cites nothing from the legislative history of the Trade Agreements Act of 1979 to support its argument. We are sure the CIT is aware of it, as are we. However, we doubt if the Columbians would be very grateful for the hastily assembled *ex parte* meeting with their representatives during the running of the 20-day period if they were told, or read in appellant's brief here, that their arguments against commencement of investigation would be ignored in deciding whether to initiate one, and considered only later and for a different purpose. We think the foreigner would be better mollified if he were frankly told the statute as construed by the courts permitted *ex parte* meetings with him, only later on, and Congress had acted to limit if not avert the harm to trade that might have been caused by an unwarranted investigation, by providing that liquidations at the old rate would continue until affirmative preliminary determinations are made.

### B

The next question we must decide is whether the CIT erred in ordering the agency to commence the investigation. Its position in substance was that the agency was obliged to commence it if "perusal" of the petition revealed that it included the necessary allegations, *i.e.*, those that, if true, would establish the existence of a dumping margin. A corollary of this position would be that an attorney for a trade association who knew how to prepare a pleading could make it a mandatory or ministerial duty of the ITA to initiate the investigation, even though to the agency's

certain knowledge, the investigation would be unwarranted. We have already shown that this would be true insofar as the information to show the investigation was unwarranted would have to come from the target of the investigation itself, and was not in the possession of the government on the filing date. This is not to say, however, that no screening of the petition with the aid of agency expertise is permissible, and that a private organization can requisition the investigative resources of the United States without the United States having a word to say about it. The CIT judge conceded, as the legislative history he relied on (see above) obliged him to do, that the ITA might screen to the extent of taking "judicial notice" of "facts within the public domain." He does not seem to have considered the potential magnitude of this concession, and its inconsistency with a holding that a judge could ascertain by "perusal" of a petition and supporting material, whether counsel for the Trade Association had used the right magic words and made it mandatory to commence an investigation.

Since the agency is to investigate *sua sponte* only if, on the basis of knowledge in its possession, investigation is "warranted," it would be absurd and inconsistent to say an outside party could compel an investigation the agency knew of its own knowledge would be unwarranted. If such an interpretation would be possible within the statutory language, it should be avoided. The language can also be read to permit the agency to assess the sufficiency of the petition in light of its own knowledge and expertise. The legislative history shows that something like this was intended. What information is within the "public domain"? Certainly, statutes, regulations, other Federal Register material, government statistics and publications. Certainly, laws, regulations, and possibly more, of the interested foreign government. Certainly, whatever assistance the agency offers, and Congress expects it to help a good deal. The Senate Committee said:

> The committee expects the authority to advise and to assist private parties as appropriate, *before they file a petition.*

[Emphasis supplied.—S.Rep. No. 96–249, *Trade Agreements Act of 1979,* 2 U.S.Code Cong. & Ad.News, 96 Cong. 1st. Sess. 1979, 381,449.]

The reference to "judicial notice" invites attention to Federal Rule of Evidence § 201, which defines what facts may be judicially noticeable.

(b) *Kinds of facts.* A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Rule 803(8) is also to be noted. It deals with the admissibility of *Public records and reports,* and matter there referred to is admissible as an exception to the hearsay rule even if the "declarant" is available.

■ Our conclusion is that Congress intended the application of agency expertise, not only to examine the petition and supporting data for internal inconsistencies, but also to evaluate it in light of a wide body of other information, to the end that, so far as possible, the commencement of unwarranted investigations should be avoided. For example, only a statistical expert could tell what use of census import statistics was valid and what was invalid. A judge is not by virtue of his robe an expert on the use of statistics.

It is also evident from the text of the statute, that once a petition is filed, the 20 days for required action start to run and there is no provision for extension by agreement. If, as the end of the period approaches the agency does not know whether to say yes or no, but only maybe, it has to say no in order to preserve its position. It it said yes, it would have to investigate and the chance to consider further would be gone. This might appear to be thus a counterproductive requirement from the domestic industry point of view except for the expectation that normally the authority will advise and assist petitioners before they file.

This further reflects the use of agency expertise in screening petitions, and the expectation that petitioners will respect that expertise, and resort to it before filing, correcting if possible deficiencies that would be pointed out to them. A petitioner who did not resort to this procedure might expect an initial rejection as the agency would often have no chance to make its input into the petition to obtain needed revisions, and would have to reject. Such rejection would not be final as to the dumping complaint itself because the petitioner, instructed by the rejection, could file a new petition to correct the deficiencies in the previous petition.

■ In light of these matters, even when, as here, an agency has followed procedures tainted by illegality in some respect, it must as a general rule be an abuse of authority for a CIT judge to substitute his own opinion for that of the agency and order an investigation on his own, instead of remanding the case for agency determination according to correct procedures. *See, e.g., S.E.C. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). There is no question of agency bad faith here and what the CIT should do in a case of bad faith is not here relevant. Everyone is trying to learn by doing how to operate under a novel and unfamiliar statutory procedure, casting everyone, petitioner, agency, CIT, and ourselves, in novel and unfamiliar roles. The agency personnel are shown by the record to be attempting in good faith to perform the screening function the statute, as we construe it, calls on them to perform. Even if they are mistaken in certain particulars, that is no warrant for taking out of their hands the decision that is still for them to make.

The CIT opinion seems to shuttle between saying the agency personnel have no role except to read the petition and act on it if facially within its own four corners, it meets requirements, and saying that the agency has required, contrary to statute, that the appellee supply information not reasonably available to him.

Under the former rubric, the CIT judge criticizes the agency for disregarding data submitted by appellee based on census reports, because this has previously proved unreliable in other cases. He says, unless the unreliability is—

[W]ithin common knowledge, so that the defendant [appellant here] can be said to be justified in taking what amounts to judicial knowledge of that fact, it should not be discredited merely because the same study contains data which proved erroneous as to other merchandise.

As we understand it, the appellee attempted to construct a mean or average invoice price for sales of Columbian roses for export to the United States, by use of the total numbers of entries, dollars earned, and quantities, in the census statistics. This would appear a novel and unexpected use of census statistics, and whether it is sufficiently reliable to form the basis of a decision to initiate an investigation, would seem a matter peculiarly for agency expertise. The average prices developed in this way apparently were lower than those obtained by appellee in its own commissioned study made in the country of origin. Appellee felt it had to submit the whole of this study, as part of the "information available to it."

The CIT also seems to say that a petition allegation is sufficient to mandate initiation of investigation because it alleges that roses from Columbia are being sold at less than fair value, a mere ultimate conclusion. Of course a sale at less than fair value is, in the simplest case, one where the invoice price on sales to the United States is less than the price on sales in the home market, after proper adjustments. The CIT criticizes the agency for requiring appellee to furnish statistics on prices in sales to the United States to support its allegations. This information, however, has been required for years under various antidumping regulations. *See, e.g.,* 19 C.F.R. § 14.-6(b)(2) (1958 Supp.); 19 C.F.R. § 153.-27(a)(3) (1979). Current agency regulations require submission of United States price data only "to the extent *reasonably availa-*

*ble* to the petitioner." 19 C.F.R. § 353.36(a) (1982) (emphasis added). This regulation is in no way inconsistent with statutory language or legislative intent. It may be noted that appellee did purport to furnish this information, both in its confidential survey report and in its census data. If appellee said the information was not reasonably available, that would be another case. Here, however, appellee submitted not one, but two sets of data to support its allegations. If it had been willing to re-petition as the agency wished it to do, possibly it could have obtained the information from the agency or otherwise settled on some form of presentation the agency would have accepted as reliable, at least for the limited purpose of commencing an investigation, which would determine only that a prima facie case had been made.

Even if the CIT judge's criticisms of the agency's positions were more valid than we think they are, it would have been more appropriate to apply something analogous to an exhaustion doctrine, and not interfere judicially until appellee had actually attempted to submit a revised petition and established that it could in no way satisfy the agency requirements and say what it had to say to get the investigation started.

## IV—*Conclusion*

We affirm the decision of the CIT so far as it declares that the receipt of representations by the agency, ITA, from the intended targets of investigation, or their representatives, were unwarranted in law when done. We reverse the decision of the CIT so far as it orders the immediate commencement of an antidumping investigation and other related measures. We remand for further proceedings consistent with this opinion. We do not require that the action be dismissed. The CIT may monitor future proceedings to assure that they are conducted in accordance with law.

In view of the time that has elapsed, we believe it would be appropriate to allow appellee to file, if it wishes, a new petition, which will start a new 20-day period to run. When the petition is in draft form, agency staff should be available to perfect it before

filing, to the end that, if the agency again refuses to investigate after filing, there will be an issue really ripe for judicial review. The court may, if it wishes, require that the ITA staff in charge of the case shall not include persons who met with representatives of the targets of the proposed investigation and received representations by them.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

JACK R. MILLER, Circuit Judge, dissenting in part.

Although I completely agree with the majority opinion's conclusion that receipt of representations by the International Trade Administration from the intended targets of investigation, or their representatives, was illegal, I have concluded that the Court of International Trade properly held that appellee's petition satisfies the requirements of the statute, 19 U.S.C. § 1673a(b)(1), so that the petition should be reinstated and the investigation should be commenced.

The statute provides that ITA *shall* institute an antidumping proceeding if the petition alleges the elements of a dumping violation and includes information reasonably available to the petitioner supporting those allegations.

§ 1673a. *Procedures for initiating an antidumping duty investigation*

. . . .

(b) *Initiation by petition*

(1) *Petition requirements*

An antidumping proceeding shall be commenced whenever an interested party described in subparagraph (C), (D), or (E) of section 1677(9) of this title files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the adminis-

tering authority and the Commission may permit.

Within 20 days after the date of filing the petition, ITA is required by 19 U.S.C. § 1673a(c) to determine whether the petition alleges the necessary elements and whether it contains information reasonably available supporting the allegations. If this determination is affirmative, an investigation *shall* be commenced to determine whether merchandise is being sold at less than fair value.

(c) *Petition determination*

Within 20 days after the date on which a petition is filed under subsection (b) of this section, the administering authority shall—

(1) determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations,

(2) if the determination is affirmative, commence an investigation to determine whether the class or kind of merchandise described in the petition is being, or is likely to be, sold in the United States at less than its fair value, and provide for the publication of notice of the determination in the Federal Register, and

(3) if the determination is negative, dismiss the petition, terminate the proceeding, notify the petitioner in writing of the reasons for the determination, and provide for the publication of notice of the determination in the Federal Register.

Unless the ITA's determination is negative, the International Trade Commission (Commission) is to determine within 45 days after the date of filing of the petition whether there is a reasonable indication that a U.S. industry is materially injured or threatened with material injury, or establishment of a U.S. industry is materially retarded. 19 U.S.C. § 1673b(a). Then, within 160 days after the date of filing of the petition, ITA determines whether there is a reasonable basis to believe or suspect

that the merchandise is being dumped.[1] Thus, 19 U.S.C. § 1673b(b)(1) provides:

(b) *Preliminary determination by administering authority*

(1) *Period of antidumping duty investigation*

Within 160 days after the date on which a petition is filed under section 1673a(b) of this title, or an investigation is commenced under section 1673a(a) of this title, but not before an affirmative determination by the Commission under subsection (a) of this section, the administering authority shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold at less than fair value. If the determination of the administering authority under this subsection is affirmative, the determination shall include the estimated average amount by which the foreign market value exceeds the United States price.

The foregoing constitutes the screening process to weed out cases that are without merit.[2]

The legislative history of the Trade Agreements Act of 1979 (Pub.L. 96–39, 93 Stat. 144, 163) provides the guidelines intended to be followed by ITA in evaluating petitions—those specifically relating to the virtually identical statutory provision (1671a(b)) on countervailing duty investigations.

Indeed, the Committee intends that the Authority will act upon all petitions which, based upon facts reasonably available to the petitioner, make reasonable allegations of the presence of the elements necessary for the imposition of a countervailing duty under section 701(a). Consequently, the Committee expects that the Authority will act upon most petitions, rejecting only those which are clearly frivolous, not reasonably supported by the facts alleged or which omit important facts which are reasonably available to the petitioner. The Committee views the rigor of the requirements of this threshold test as roughly analogous to the rigor of the requirements necessary to make out a cause of action for purposes of civil litigation. Furthermore, if the initial petition is dismissed because

1. The majority opinion would have these determinations made *before* an investigation is initiated. Although the majority opinion asserts that it says the contrary, its subsequent description of the agency's role in evaluating petitions *at the preinvestigatory stage* belies the assertion. Specifically, the majority opinion would read the statute to allow, indeed, require, the agency to assess the allegations of the petition and the supporting data "in light of its own knowledge and expertise ... Federal Register material, government statistics and publications ... laws, regulations, and possibly more, of the interested foreign government." The majority opinion concludes that

Congress intended the application of agency expertise, not only to examine the petition and supporting data for internal inconsistencies, but also to evaluate it in light of a wide body of other information, to the end that, so far as possible, the commencement of unwarranted investigations should be avoided.

Thus, even in situations where a petitioner both alleges the elements of dumping and provides information supporting its allegations (which is all that the statute requires), the majority opinion would allow ITA to *subjectively* weigh the credibility of the petitioner's supporting data against other, contradictory data, and to make

this *factual* determination at the *preinvestigatory* stage. That is precisely what occurred in the present case.

2. The working of this screening process is recognized early in the majority opinion, thus: "If in the end the investigation proves to have been unwarranted, the reputation of the agency is not impugned. On the other hand, if the conscience of Asocoflores is clear, it can explain the initiation of the investigation to its customers as an event of no legal significance." The opinion then proceeds to explain the statutory safeguards that protect the target during the aforementioned screening process. However, the opinion subsequently says: "If, as the end of the [20-day] period approaches the agency does not know whether to say yes or no, but only maybe, it has to say no in order to preserve *its* position. If it says yes, it would have to investigate and the chance to consider further would be gone." That "chance to consider further," to determine whether there is a reasonable basis to believe or suspect that there is dumping, *comes in the 160-day period*—not in the 20-day period prescribed for considering the petition.

certain required information is not included or is not presented in a manner that is acceptable to the Authority, it is expected that the administering authority will direct the petitioner to possible sources of information.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 51 (1979).

The majority opinion proceeds on the premise that it would be absurd to say that an "outside party" (albeit an "interested party" on behalf of an industry, as provided by § 1673a(b)(1)) could compel an investigation the ITA knows of its own knowledge would be unwarranted. However, Congress did not provide a "knows of its own knowledge" test. Rather, its guidelines are those quoted above, although it would be reasonable to conclude that rejection of petitions which are "clearly frivolous, not reasonably supported by the facts alleged or which omit important facts which are reasonably available to the petitioner" would avoid most "unwarranted" investigations. The point should be emphasized, however, that the intent of Congress was for ITA *not* to determine the relative credibility of conflicting evidence at the preinvestigative stage, as the majority opinion would do. Thus:

The committee intends section 732(c)(1) [1673(c)(1)] to result in investigations being commenced unless the authority is convinced that the petition and supporting information fail to state a claim upon which relief can be granted under section 731 or the petitioner does not provide information supporting the allegations which is reasonably available to him....

The committee intends the determination as to the information "reasonably available" to a petitioner to be made in light of the circumstances of each petitioner. Information may be reasonably available to one petitioner but not to another because of differing resources or other characteristics.

S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979) *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 449.

The Committee has long been concerned that petition requirements not be so onerous as to preclude petitioners presenting meritorious complaints from obtaining the remedy provided by the law. The Committee therefore intends that no petitioner shall be required to provide information not reasonably available to him. An evaluation of what information is reasonably available will be made on the basis of the resources of the individual petitioner. The petitioner will be expected to use reasonable efforts to collect information from public and industry sources.

H.R.Rep. No. 317, 96 Cong., 1st Sess. 60 (1979).

The majority's quotation of the colloquy between Senators Ribicoff and Danforth is particularly illuminating of the intent of Congress that ITA is to "look only to the four corners of the petition—the pleading—and the information filed supporting the allegations and not elsewhere." Nothing is said about "agency expertise" or what ITA "knows of its own knowledge." Judicial notice of facts in the public domain may be taken by ITA, but this does not include all facts in the public domain—only those facts of which judicial notice can be taken. *See* Rule 201 of the Federal Rules of Evidence:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Finally, I see no good reason for overruling the Court of International Trade's determination that the allegations of appellee's petition satisfy the requirements of the statute and that the supporting information from both public study and private industry survey tends to support these allegations. The petition was rejected for two reasons—because U.S. price data were not supplied and because of an apparent conflict between a Bureau of Census report (which supports appellee's allegations) and a market research report prepared by ap-

pellee, which explained why the figures in its report were not credible and that the figures were submitted merely for completeness in order to comply with its duty of disclosure. I would hold that, assuming the above-referred to guidelines are satisfied, evaluation of the information provided by appellee should be left to the investigative stage rather than made before an investigation is commenced.[3]

Also, I agree with the Court of International Trade's holding that ITA erred in requiring appellee to furnish data on U.S. selling price in its petition, absent a showing that such information was "reasonably available" to appellee.

---

**3.** This conclusion is supported by 19 U.S.C. § 1677e, which requires that all information relied on for a *final* determination *in an investigation* be verified if possible, thus:

§ 1677e. *Verification of information*

(a) *General Rule*

Except with respect to information the verification of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition.

(b) *Determinations to be made on best information available*

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.