**FLOREX, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**and**

**Floral Trade Council of Davis, California, Defendant–Intervenor.**

**Court No. 87–05–00686.**

United States Court of International Trade.

Jan. 6, 1989.

cause to arrest Costner. The subsequent search of Costner was valid as one incident to his arrest."

Duncan, Allen and Talmage, Leslie Alan Glick, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Elizabeth C. Seastrum), Civ. Div., U.S. Dept. of Justice; Duane W. Layton, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce; Judith M. Czako, Office of General Counsel, U.S. Intern. Trade Com'n, Washington, D.C., for defendant.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Jimmie V. Reyna, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

This matter is before the court on plaintiffs' motion for judgment on the agency record. At issue are the final determinations of the International Trade Administration of the Department of Commerce (ITA) and the International Trade Commission (ITC) involving fresh cut flowers from Mexico. Plaintiffs are various producers in Mexico who were respondents in the agency investigations. The court will first address the issues arising out of the final affirmative ITA determination in *Certain Fresh Cut Flowers from Mexico*, 52 Fed. Reg. 6361 (March 3, 1987).

A. ITA Issues.

1. *Standing*

a. Interested Party

Plaintiffs challenge the ITA's determination that Floral Trade Council of Davis (FTC) is both an interested party and represents the relevant domestic fresh cut flower industry. 19 U.S.C. § 1673a(b)(1) (Supp. IV 1986) reads as follows:

(b) Initiation by petition

(1) Petition requirements

An antidumping proceeding shall be commenced whenever an interested party described in subparagraph (C), (D), (E), or (F) of section 1677(9) of this title files a petition with the administering authority, on behalf of an indus-

try which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.[1]

As to the first requirement, that the petitioner be an interested party, plaintiffs assert the petitioner did not allege in its petition facts sufficient to establish that it qualifies as an interested party under section 1677(9)(E) or (F), that is, that it is a trade association, a majority of whose members produce or wholesale the fresh cut flowers under investigation. FTC is a trade association. In its petition, FTC alleged that a majority of its members produced a product like that subject to investigation. Thus, FTC made the necessary allegations. At the petition sufficiency stage, ITA proceedings are *ex parte*. It is inappropriate to accept submissions by respondents at this stage. *See United States v. Roses, Inc.*, 706 F.2d 1563 (Fed. Cir.1983).[2] Finding no reason to doubt the correctness of the allegations made by petitioners at the initial stage, ITA accepted FTC's representations as to its status as an interested party.

During the proceedings, respondents challenged the allegations of FTC. All parties agree that standing may be challenged subsequent to the initial *ex parte* stage of the proceedings. At a hearing before ITA, FTC alleged that 100% of its members grow fresh cut flowers. Plaintiffs now state that FTC has never alleged that this 100%, or even the statutorily required majority, produces or wholesales at least one of the seven cut flowers subject to the simultaneous flower investigations or the three flowers involved with regard to Mexico. In fact, FTC alleged at the hearing before ITA that ITC had information on a flower-by-flower basis, which information would illuminate the issue of FTC's relation to the totality of growers. Such information might also indicate which of FTC's members grew the particular flowers at issue, or FTC could have provided such information if ITA had considered this a serious issue. Although respondents mentioned the need for further investigation as to this issue in their prehearing brief, Public Record Document Number (PR) 105 at 2, in their post-hearing brief, plaintiffs did not cite to any particular information on this issue or request ITA to review data from ITC on this subject.[3] Thus, it would not have been clear to the agency whether plaintiffs were adhering to their objections in the face of FTC's statements at the hearing.

1. 19 U.S.C. § 1677(9) (1982 & Supp. IV 1986) reads in pertinent part:

> (C) a manufacturer, producer, or wholesaler in the United States of a like product,
> (D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a like product,
> (E) a trade or business association a majority of whose members manufacture, produce, or wholesale a like product in the United States, and
> (F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a like product.

2. It is unnecessary in this case to reach a decision as to whether ITA may accept submissions by domestic interests regarding standing at this stage, as none were offered. The court notes that in *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075 (1988), some of the "domestic" parties attempting to submit information at the early stage were comprised of some importing interests. Activities during the first stage did not appear to be a focal issue of that case, *see* 704 F.Supp. at 1084, and it is not of great concern here.

3. In their briefs before the court plaintiffs refer to certain ITC information. Plaintiffs neither put that information before ITA nor asked ITA to review it. Thus, ITC's information is not part of the record for the purpose of review of ITA's decision. The confidentiality of the information would not seem to bar ITC's provision of a synopsis or expurgated version to ITA or plaintiff. It was plaintiffs' burden to pursue this in view of the allegations made by FTC, and the apparent lack of industry opposition.

It is at least a theoretical possibility, based on the record before the ITA, that less than a majority of the members of FTC produce or wholesale one or more of the flowers under investigation. But this case may only be judged on the record before the court. No evidence was produced indicating that FTC was not an interested party and certainly no members of the domestic industry opposed the petition on this, or any other ground. The only relief available would be to remand on the basis of inadequacy of investigation. It would seem inappropriate under the circumstances of this investigation, including the manner in which plaintiffs presented this argument, to remand this action to the agency to investigate the speculation of respondent in an effort to determine if a technical defect exists as to petitioner's standing. Any such defect likely was easily amendable.[4]

Clearly, the standing provision is intended to protect the domestic industry and to save ITA the effort of investigating unsupported petitions.[5] Presumably respondents also are not meant to be harassed by frivolous petitions, but without some evidence of record suggesting that FTC is not an interested party, or that ITA clearly erred by failing to investigate further, the statutory purposes of the standing provisions would not be served by remand for investigation of this point. ITA's position that it was not required to undertake further investigation on this issue seems well taken based on the facts of this particular case. The agency is not required to investigate every possibility. Furthermore, *Citrosuco Paulista, S.A. v. United States,* 12 CIT —— at ——, 704 F.Supp. 1075 at 1084 (1988) indicates that interested party problems do not, in every case, require a new petition and investigation, because ITA may commence proceedings *sua sponte.* What limits may exist as to ITA's discretion in this area need not be addressed here because of the factors discussed *supra* and those mentioned in the following section. The record in this case does not indicate lack of standing on this basis. Based on the facts of this case, there is no adequate reason for remand for further investigation of this issue.

### b. Representation of the Domestic Industry

Plaintiffs also allege that FTC did not act "on behalf" of the domestic industry because only 92 of its members signed the petition filed herein and because these 92 members represent a small part of the cut flower industry. FTC is composed of 260 growers of fresh cut flowers. There are alleged to be from 500 to several thousand commercial growers of fresh cut flowers in the United States.[6]

The fact that only 92 FTC members signed the petition does not indicate that other members of the industry do not support the petition. ITA's position is that it need not look beyond the petition as to this element of standing unless information is produced indicating that the domestic industry does not support the petition. Representativeness is not defined by the statute. Unfair trade proceedings are very expensive, thus, they are often brought by trade associations as opposed to individuals. Individuals may file petitions. The filing of a petition by a trade association, however, is normally some indication, in itself, of industry support. Certainly it is

---

**4.** ITA may accept an amendment to the petition without commencing a new investigation. *Citrosuco Paulista, S.A. v. United States,* 12 CIT —— , at ——–——, 704 F.Supp. 1075 at 1083–84 (1988). If this issue had been shown to be a genuine problem, the petition might have been amended to be a petition by those members of FTC which produced the relevant flowers. Plaintiffs make no allegation that none of the 92 signers produced the relevant flowers.

**5.** S.Rep. No. 249, 96th Cong., 1st Sess. 63, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381,449 states:

The committee intends that the standing requirements be administered to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation.

**6.** The higher figures have not been shown to relate to cut flower growers exclusively and seem for the most part to be from ITC not ITA records.

unlikely that FTC would file a petition if the majority of its members opposed it. Based on the ITA record, a majority of FTC's membership would seem to constitute a large fraction of the domestic flower industry, if one views the industry on a grower by grower basis. In addition, ITA did not receive one U.S. industry submission indicating opposition to the petition. Thus, ITA appears to have acted reasonably in accepting the petition as representative of the industry's view and in adhering to that position.

The one case cited by plaintiffs on this point is inapposite. *Gilmore Steel Corp. v. United States,* 7 CIT 219, 585 F.Supp. 670 (1984) involved the issue of whether ITA *may* terminate an investigation when industry opposition indicates the petition is not being prosecuted on behalf of the industry. In *Gilmore,* the court indicated that in the face of such manifest opposition the investigation could be terminated as to the concerned national industry. The case was remanded, however, for a decision on whether the petitioner represented a regional industry.[7] Absolutely none of this indicates that ITA's view, that it *may* accept the petitioner's allegations as to its representation of industry views until industry lack of support is demonstrated, is erroneous.

### c. Action by ITC

■ The court finds no indication that ITC erred in finding FTC had standing. Plaintiffs raised the issue in their reply brief before this court of whether ITC should have found lack of representativeness because plaintiffs deduced from information before ITC that FTC represents a small portion of the producers of the three flowers from Mexico subject to investigation. ITC seems to defer in most matters to ITA, on the issue of standing. At least, in the first instance, ITA should make the ruling on standing as part of its petition

sufficiency determination. Had ITC's investigation raised indications of lack of industry support, it might be appropriate to pursue the issue of the proper roles of ITA and ITC on this issue. Such indications of lack of support are missing, however. Furthermore, plaintiffs have not alleged that they pursued this issue at ITC after the information they rely on here surfaced. In any case, none of plaintiffs' arguments overcomes the numerous other indications of industry support found in the record of both agency proceedings.

### 2. Use of Best Information Available for Plaintiff Visaflor

■ Plaintiff Visaflor does not dispute that its submission contained numerous errors and omissions including errors in U.S. sales price data and omission of at least one U.S. sale. Omitted U.S. sales are considered a serious error by ITA. ITA cannot discover such errors until verification. Capture of all U.S. sales at their actual price is at the heart of ITA's investigation. Furthermore, the record reveals that nearly half of all home market sales examined by Commerce inaccurately reported price, quantity or grade. ITA also discovered at verification that respondent sold other flower types than were indicated in its response. The questionnaire response was replete with other errors. In such a situation ITA is justified in finding a failure of verification. Such a finding is essentially the same as a finding of failure to respond at all. In fact, it may be worse because ITA had to expend time at verification to discover the errors made in the response. Pursuant to 19 U.S.C. § 1677e (1982 & Supp. IV 1986), in both situations ITA must use best information available in order to conclude its investigation.

Visaflor argues ITA did not use the best information available. Visaflor claims that the proxy margin rate selected was that of

---

7. Recently in *Oregon Steel Mills, Inc. v. United States,* 862 F.2d 1541 (Fed.Cir.1988), the Court of Appeals held that ITA *could* revoke an antidumping order as a corollary to voluntary restraint agreement implementation where Gilmore and another company were the only companies opposing revocation. In that case, a ma-

jority of the U.S. steel producers voiced their lack of support for the continuation of antidumping duty proceeding by writing to the ITA. No such action occurred here. *See Citrosuco* at ——, 704 F.Supp. at 1085 (distinguishing *Oregon Steel* and *Gilmore* ).

a company with much different conditions of operation, such that its margin cannot be considered the best information available as to Visaflor. It is ITA's standard practice to assign the highest margin determined for any of the respondents to non-responding, or verification failing, producers. This methodology is an attempt to avoid rewarding producers for failure to respond or to present verifiable information. One cannot be certain it always accomplishes the purpose because the respondents's margin theoretically could have been higher than the assigned margin, but in most cases use of the highest rate determined will accomplish the intended purpose.

Visaflor's request that rates attributable to a more similarly situated company be used is really a request that some information about Visaflor be used. Visaflor failed verification; it is not entitled to a detailed comparison of its activities with those of potential substitutes so that ITA can obtain the closest match. There is simply no guarantee that the rate attributable to the company which appears most similar would be the rate which Visaflor would merit had it responded properly.

Assuming *arguendo* that Visaflor is correct to the extent that it claims that it must be given the rate of uniquely similar companies as opposed to one which is totally unfit for comparison, Visaflor has not demonstrated that the fit is so exact for one or two other companies and so bad for the company selected by ITA that ITA's choice must be rejected. ITA's decision that the best rate available is the highest rate available is not unreasonable in this case.

### 3. *Treatment of Consignment Sales*

a. Inclusion of Consignment Sales in Calculation of U.S. Price

■ At oral argument plaintiffs withdrew their argument that inclusion of below cost sales in the monthly average of

U.S. price is error.[8] Assuming *arguendo* that the related argument, that consignment sales should not be included, remains, it has not been found meritorious. *See Asociacion de Colombiana de Exportadores de Flores v. United States*, 12 CIT ——, at —— ——, 704 F.Supp. 1114 at 1120–21 (1989).

### b. Verification of Broker Consignment Sales Data

■ Plaintiffs allege that their brokers may be selling at higher prices than plaintiffs' own records indicate. They produced no data to demonstrate this, but claim that ITA should not have accepted the producers' records, and should have instead verified data on the premises of each broker. There is no requirement that ITA verify transaction data on both the principal and agent sides. To do so would seem overly burdensome. Furthermore, the court will not order ITA to conduct further verification based on plaintiffs' speculation.

### 4. *Constructed Value*

a. Use of Best Information Available in Lieu of Verifiable Grower Cost Data

■ Certain growers did not fully respond to ITA's questionnaire. Plaintiffs allege that they did not respond because pursuant to local accounting practice they did not keep cost records. There is no dispute as to the existence of this local accounting practice. Accordingly, ITA used best information available to fill in any gaps in its cost of production data for constructed value purposes. ITA is not required to use only information that is kept in accordance with local standards. ITA must make adjustments in order that the information it does accept from respondents will reflect reality. *Cf. Ipsco, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 633, 636 n. 3 (1988) (citing H.Rep. No. 571,

---

**8.** Plaintiffs also made the argument that actual home market sales should have been used for certain producers rather than constructed value because ITA's use of an average for U.S. price, which included distress sales, rendered the comparison with constructed value unfair. ITA determined that the relative volume of home mar-

ket sales was too low to permit use of such sales. Plaintiffs have not offered any evidence based on which the court must conclude that home market sales were adequate. In any case, plaintiffs abandoned their main argument supporting this objection.

93rd Cong., 1st Sess. 71 (1973) and 19 U.S. C. § 1677b(b).) ITA determined here that the growers' cash-basis accounting methods did not take into consideration certain actual costs, for example, those attributable to depreciation. 52 Fed.Reg. at 6363.[9] Where data was missing, ITA properly used data from other sources. *See* 19 U.S. C. § 1677e.

### b. Allocation of Costs Based on Acreage of Plantings

■ Where cost data was not identifiable by flower type, ITA allocated on an acreage planted basis. 52 Fed.Reg. at 6364. Plaintiffs have not provided any persuasive reasoning that allocation based on sales volume, as they propose, is a reasonable approach to the problems at hand, let alone the only rational approach. ITA is not responsible for the fact that the growers do not maintain complete cost data. ITA had to arrive at a methodology to deal with gaps of information. Its approach has not been shown to be unreasonable.

### c. Other Arguments re Constructed Value

■ The court will not consider objections which are not supported by proper citations to the record, such as objections to certain salary costs, and failure to allocate start-up costs.[10]

### 5. *Level of Trade Adjustment*

■ In their brief to the court, plaintiffs argue that ITA should have made a level of trade adjustment, pursuant to 19 C.F.R. § 353.19 (1988), because Mexican home market sales were often made in small quantities and directly to retailers whereas U.S. sales were "almost always in bulk to wholesalers." Plaintiffs' Brief at 46. Defendant responds that this claim must be rejected because plaintiffs failed to raise it before the agency.

ITA regulations make clear that the party which alleges entitlement to a level of

trade adjustment must "establish entitlement thereto to the satisfaction of the Secretary." 19 C.F.R. § 353.13. Plaintiffs did not respond to defendant's argument that this claim must be rejected because it was not made at the administrative level, nor does the record indicate that this claim was pursued at the administrative level. Defendant also contends that without evidence of differing prices at various levels it would not make a level of trade adjustment. Defendant states this information is lacking and plaintiffs have not cited either direct or indirect evidence as to differing prices. Plaintiffs have the burden of supporting their claim for a level of trade adjustment. *See Fundicao Tupy S.A. v. United States*, 12 CIT ——, 678 F.Supp. 898, 900 (1988), *aff'd* 859 F.2d 915 (Fed.Cir. 1988); *cf. American Permac v. United States*, 12 CIT ——, 703 F.Supp. 97 (1988). Plaintiffs have failed to meet that burden.

### B. ITC Issues.

ITC's final determination in this matter, *Certain Fresh Cut Flowers from Peru, Kenya and Mexico*, USITC Pub. 1968, Inv. No. 303–TA–18 and Inv. Nos. 731–TA–332 and 333 (April 1987) (*Flowers II*) refers to many conclusions reached in *Certain Fresh Cut Flowers from Canada, Chile, Colombia, Costa Rica, Ecuador, Israel, and The Netherlands*, USITC Pub. 1956, Inv. Nos. 701–TA–275 through 278 and Inv. Nos. 731–TA–321 through 331 (March 1987) (*Flowers I*). Both determinations are necessary to an understanding of the ITC Issues raised here.

### 1. *Defects in ITC's U.S. Grower Questionnaire Methodology*

■ Plaintiffs contend that ITC's method of collecting industry data was improper for several reasons, each of which will be discussed separately.

---

**9.** Plaintiffs claim all property was previously fully depreciated. Plaintiffs do not assert whether this reflects reality, but plaintiffs cited no record evidence concerning depreciation.

**10.** Plaintiffs made another objection concerning the Concurrence Record of the Final Determination Calculation. The significance to plaintiffs of the alleged error was not explained.

### a. Selection of Population [11]

█ Plaintiffs' basic argument in this regard is that ITC did not review the list of questionnaire recipients compiled by the Department of Agriculture (USDA). ITC did not review what USDA did because USDA's master list is confidential. Because ITC did not review directly what USDA did, the court, in turn is unable to review what USDA did. Plaintiffs have not established, however, that ITC was incorrect in concluding from public information about USDA's data that it was the most comprehensive available.[12] Thus, if USDA was to be rejected as a source of U.S. grower identification it would be solely because of the confidentiality problem.

Plaintiffs' legal contention is that ITC's use of the mailing lists compiled by USDA for ITC constituted an unlawful delegation of ITC's authority. Reviewability is the key to avoidance of delegation problems. *See Pistachio Group of the Ass'n of Food Indus. v. United States,* 11 CIT ——, 671 F.Supp. 31 (1987). As ITC set the criteria for compilation of the mailing list and as ITC's directions to USDA are not a source of dispute, the only question which arises is whether USDA actually did what it was requested to do by ITC. This is the only potentially unreviewable action. There is, however, no evidence that USDA performed anything but a ministerial act in compiling the ITC list from its master list. Therefore, there is no partially or fully discretionary function assigned to ITC by the Congress which ITC has in turn assigned to another. This factor alone distinguishes this case from *Pistachio Group,* on which plaintiffs rely.

In addition, plaintiffs have not pointed to any information of record which would indicate that only certain classes of individuals responded. This might be evidence that

USDA did not do what ITC instructed. Nor has plaintiff cited any reason why the court should assume that USDA had some motivation for not following ITC's direction.

Obviously, it is preferable for ITC's purposes, as well as for the purposes of those affected by ITC's determination, if access to mailing lists used for ITC investigations may be made available to ITC. Many of ITC's choices, however, rest on utilization of public information, the background data for which may be confidential. This does not bar the use of the end result data. This situation is similar. Here, ITC apparently decided that despite the disadvantage of lack of direct access to the USDA data, it would make a choice in favor of comprehensiveness. This was a reasonable choice. As there is no data which would cause one even to suspect that USDA did not do as it was instructed, the court does not find any error to have occurred in this regard.

Furthermore, ITC did not rely on USDA alone. It made its own mailing to 152 growers, 170 importers, and 100 purchasers. Undoubtedly, there was some overlap between the lists of growers compiled by ITC and USDA.

█ Plaintiffs also object that ITC relied on petitioner's data in compiling its lists and ignored data submitted by Florists' Transworld Delivery Association (FTD). The record indicates that both FTC and FTD data was considered. PR 195. (It should also be noted that FTD suggested the USDA list as the most comprehensive.)[13] After questionnaires were mailed and after the due date for the responses, FTD submitted further information to ITC. It was not unreasonable for ITC to reject such data, which would have required a supplemental mailing.

---

**11.** The court rejects plaintiffs' argument that the small response, by itself, indicates invalid selection methodology. One would not expect a large response to a lengthy questionnaire in an industry composed of numerous small owner-operated agricultural concerns.

**12.** USDA's list contained 457 grower names while ITC's internal list named 152 growers. *Flowers I* at A–7.

**13.** That USDA's listing might have included some growers who did not produce the flowers at issue is of little concern. The responses call for an indication of what flowers are actually grown.

#### b. Review of Grower Responses by FTC

 Plaintiffs object to FTC's review of grower responses by FTC before they were submitted to ITC. Some 86 domestic growers chose to send their responses through FTC, a trade association of domestic growers. FTC then forwarded the responses and also sent a list of corrections. ITC chose what consideration to give to the corrections. Plaintiffs have not demonstrated that they have been injured in any way by what appears, in any case, to be an acceptable procedure.

#### c. Selection of Periods for U.S. Price Data Collection

 Plaintiffs allege that ITC's conclusion as to the price depressive effects of Mexican imports is based on data from periods during which price underselling by Mexican imports is likely to occur rather than on a balanced sampling of periods, which would include post-holiday periods of distress sales, at more uniform prices. ITC chose six non-holiday weeks and six holiday weeks. ITC also relied on broad ranging data provided by USDA.

Both importers and growers appeared to agree that it was important to look at holiday and non-holiday periods. Additional investigation of post-holiday distress sales data would not add a great deal of useful information to this record. ITC seeks to arrive at a general conclusion about price underselling over a three year period of time. Its conclusion is not quantified. (In contrast, ITA's margin determination is a quantification.) ITC's data was adequate for it to reach an overall conclusion about price depression.

#### 2. *Cumulation*

 Plaintiffs allege that ITC erred in cumulating imports of Mexican flowers with imports under investigation from other countries. Pursuant to 19 U.S.C. § 1677(7)(C)(iv) (Supp. IV 1986), ITC must cumulatively assess the volume and price effects of imports which are subject to investigation and which compete with each other and like U.S. products. Plaintiffs argue that because other imports were en-

tered through different ports of entry than were Mexican imports, that Mexican imports did not compete with others. Plaintiffs also allege different channels of trade and failure to separately assess competition for various flower types.

In assessing whether there was competition among the various imports from different countries, ITC considered fungibility, sales or offers for sales in the same geographic markets, similarity in channels of distribution and simultaneity of presence in the market. *Flowers I* at 15. In *Flowers I*, ITC clearly indicated it made its cumulative analysis by separate flower type. *Id.* at 18. On the issue of cumulation, no significant information was submitted to ITC between the issuance of *Flowers I* and the close of the record in *Flowers II.*

As to plaintiffs' argument that competition between Mexican imports and other imports is limited because of differing ports of entry, the record does not indicate the existence of only local markets. The record does indicate substantial shipment of flowers throughout the United States and interrelated channels of distribution with competition at various levels. While Houston may be the major port of entry for Mexican flowers, the record indicates importation of Mexican flowers through other ports. It also indicates entry of other imports through Houston. Completely overlapping markets is not required. *See Fundicao Tupy*, 678 F.Supp. at 902.

#### 3. *Substantial Evidence for ITC's Finding of an Injured Industry*

 First, as to the issue of the state of the domestic industry, the court has sustained the view of the ITC majority that the industry involved is actually several industries. *See Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT ——, 693 F.Supp. 1165, 1170 (Remanded). That finding, which would seem to be applicable here, is not disputed by plaintiffs. It also was not challenged following the above-mentioned remand on other grounds. *See Asociacion Colombiana de Exportadores de Flores v. United*

*States*, 12 CIT ——, 704 F.Supp. 1068 (1988). Thus, the overall health of the U.S. flower industry in general, which includes producers of non-investigated flowers, is irrelevant.

Second, as to the state of the three relevant industries there is some conflicting evidence, which ITC considered according to proper procedures, as indicated previously. Each industry will be considered separately.

### a. Standard Carnations

■ In support of their belief that the domestic industry producing standard carnations was uninjured, plaintiffs cite a rise in domestic shipments as well as rising net sales. While acknowledging rising net sales and a slight rise in domestic shipments in 1984, ITC noted declining domestic shipments in subsequent years, declining market share and declining net income. *Flowers I* at 24–26. As plaintiffs do not challenge the existence of the basic data, but only the conclusion to be drawn from such data, this appears to be a case of weighing less than conclusive data. Based on this record the court holds that ITC's finding of an injured standard carnation industry is supported.

### b. Standard Chrysanthemums

■ Regarding standard chrysanthemums, plaintiffs indicate that although U.S. shipments declined, imports declined by much greater percentages. ITC noted recent declining domestic consumption, overall declining production and shipments and insufficient recent improvement in market share and net income to overcome the general decline. *Id.* at 28–31. The same problem exists as to plaintiffs' argument in this regard as existed with regard to the standard carnation industry. Based on this record the court holds ITC's finding of an injured chrysanthemum industry is supported.

### c. Pompon Chrysanthemums

■ Plaintiffs cite increased domestic consumption and a rise in domestic production during certain periods in support of their argument that the domestic pompon chrysanthemum industry is uninjured. ITC cited declines in production in other periods as well as declines in shipments, market share, net sales and net income (between 1983 and 1985). *Id.* at 33–35. As with the other two industries the court finds ITC's determination of an injured pompon chrysanthemum industry is supported.

### 4. *Causation*

■ Plaintiffs also allege that ITC's finding of a link between imports and material injury is unsubstantiated. Plaintiffs cite nothing to support their allegation with regard to standard carnations. With respect to standard chrysanthemums, plaintiffs allege that the fact that imports were declining at a faster rate than domestic shipments demonstrates no causality. Additionally, plaintiffs attribute declining domestic production to declining yields per square foot. ITC, instead, focused primarily on price effects, which plaintiffs do not discuss. ITC did not err in focusing on price effects in reaching its causation conclusion. This is a standard and long accepted approach. The court finds that ITC's methodology was not in error and ITC's decision is not unsubstantiated.

■ As to pompon chrysanthemums, plaintiffs blamed the condition of the U.S. industry on weather. Plaintiffs ignores that imports need not be the only cause of harm. *See British Steel Corp. v. United States*, 8 CIT 86, 593 F.Supp. 405 (1984). The record does not show that weather, and not imports, contributed to the material injury observed. ITC could conclude based on this record that both caused harm. Plaintiffs also claim that foreign producers produced more marketable pompons and served customers better. Plaintiffs, however, have not challenged ITC's finding that U.S. chrysanthemums were "like" the foreign chrysanthemums, nor have they indicated that ITC should make certain specific adjustments for differences in quality. Furthermore, injury need not be based on a finding of injury by specific price underselling. ITC may consider, as it did, the suppressive price effects of the unfairly traded imports. ITC

made a choice between one view which the court finds supported and another view, which might also be supported. This is not grounds for rejection of the determination.

### Conclusion

The final determinations of the ITC and ITA are sustained.

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiffs' motion for judgment based upon the administrative record is denied and this action is hereby dismissed.