**NIPPON PILLOW BLOCK SALES CO., LTD. and FYH Bearing Units U.S.A., Inc., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company; Federal–Mogul Corporation, Defendant–Intervenors.**

**Court No. 91–08–00555.**

United States Court of International Trade.

April 23, 1993.

Tanaka & O'Leary, H. William Tanaka, Michele N. Tanaka, Michael J. Brown and John J. Kenkel, Washington, DC, for plaintiff.

Baker & McKenzie, Kevin M. O'Brien, Richard G. King and Joseph E. Downey, Washington, DC, Emerson Power Transmission Corp., amicus curiae in support of plaintiff's motion.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Velta A. Melnbrencis and Jane E. Meehan), of counsel; Stephen J. Claeys and Dean A. Pinkert, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert De Prest, John M. Breen, Patrick J. McDonough, Margaret L.H. Png and Amy S. Dwyer, Washington, DC, for defendant-intervenor The Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley and Joseph A. Perna, V, Washington, DC, for defendant-intervenor Federal–Mogul Corp.

**OPINION**

TSOUCALAS, Judge:

Plaintiff, Nippon Pillow Block Sales Co., Ltd. and FYH Bearing Units U.S.A., Inc. ("NPB"), commenced this action to challenge certain aspects of the Department of Commerce, International Trade Administration's ("ITA") final results in the first administrative review of imports of antifriction bearings ("AFBs") from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 56 Fed.Reg. 31,754 (1991). Substantive issues raised by the parties in the underlying administrative proceeding were addressed by the ITA in the issues appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Issues Appendix")*, 56 Fed.Reg. 31,692 (1991).

In this proceeding NPB challenges: (1) the ITA's determination that NPB failed the ITA's cost verification and (2) the ITA's use of best information otherwise available ("BIA") for NPB's dumping margin. In addition, if the Court remands this case back to the ITA, NPB requests the Court to instruct the ITA not to compare sales of dissimilar quantities of AFBs when comparing home market and U.S. sales. *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record Pursuant to USCIT Rule 56.1 ("NPB's Memorandum")* at 15–93.

*Background*

On June 11, 1990, the ITA initiated an administrative review of imports of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews*, 55 Fed.Reg. 23,575 (1990). NPB participated in this review. Administrative Record Japan Public Document ("AR Japan Pub. Doc.") 9.

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results")*, 56 Fed.Reg. 11,186 (1991). In the Preliminary Results, the ITA assigned NPB a 54.54% margin for ball bearings. NPB's sales of cylindrical roller bearings and spherical plain bearings were not subject to this review. *Preliminary Results*, 56 Fed.Reg. at 11,189.

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results*, 56 Fed.Reg. 31,754. The ITA assigned NPB a margin of 45.83% for ball bearings. *Id.* at 31,756.

During the course of this administrative review, NPB submitted cost of production and constructed value data for the types of AFBs which it sold in the home market.[1] AR Japan Pub.Doc. 443. The ITA had requested that NPB provide this data on a model-specific basis. However, in the ordinary course of its business NPB did not record its expenses on a model-specific basis but rather on an aggregate basis. Therefore, NPB reported its costs on an aggregate basis and developed a methodology for allocating these costs on a model-specific basis. *Id.*

On October 30, 1990, the ITA notified NPB that reasonable grounds existed to believe that NPB sold AFBs in the home market at below cost of production prices. AR Japan Pub.Doc. 451.

From December 17 to December 20, 1990, the ITA conducted verification of NPB's cost of production and constructed value data. AR Japan Pub.Doc. 658. The ITA verified all of the underlying factual data submitted by NPB, including: aggregate in-house labor costs, aggregate overhead and model-specific subcontracting costs. *Id.*

At verification, the ITA discovered that NPB's method for allocating in-house labor costs and overhead on a model-specific basis was based on the ratio of each model's subcontracting costs for outer ring turning, one of the production steps which occur when making the outer ring of an AFB, to that model's total sub-contracting and material costs. *Id.* The ITA also discovered that some AFB production steps were being conducted by subcontractors for certain bearing models and that the same production steps

1. In an administrative review, the ITA is required to calculate "the foreign market value and United States price of each entry of merchandise subject to [an] antidumping duty order" and determine "the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry." 19 U.S.C. § 1675(a)(2) (1988).

19 U.S.C. § 1677b(a) (1988) defines foreign market value:

**(1) In general**
The foreign market value of imported merchandise shall be the price, ...
(A) at which such or similar merchandise is sold ... in the principal markets of the country from which exported ..., or
(B) if not so sold or offered for sale for home consumption, ... then the price at which so sold or offered for sale for exportation to countries other than the United States,

**(2) Use of constructed value**
If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.
"Constructed value" is defined at 19 U.S.C. § 1677b(e) (1988):
**(e) Constructed value**
**(1) Determination**
For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—
(A) the cost of materials ... and of fabrication or other processing of any kind employed in producing such or similar merchandise ...;

(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation ..., except that—
(i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and
(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost; and
(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise under consideration in condition, packed ready for shipment to the United States.
The ITA requests cost of production data from respondents because it is necessary for the calculation of constructed value.
In addition, 19 U.S.C. § 1677b(b) (1988) requires that:
**(b) Sales at less than cost of production**
Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market ... have been made at prices which represent less than the cost of producing the merchandise [and such sales]—
(1) have been made over an extended period of time and in substantial quantities, and
(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade
such sales shall be disregarded in the determination of foreign market value ... [and] the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.
*See also* 19 C.F.R. §§ 353.50, 353.51 (1991).

were being conducted in-house for other bearing models. *Id.* The ITA concluded that the use of subcontracting costs as the basis for allocating in-house labor and overhead could lead to over- or under-allocation of these costs and, therefore, rejected NPB's allocation methodology for model-specific in-house labor and overhead. *Id.* The ITA requested NPB to develop an alternative allocation methodology. *Id.*

The ITA also had a problem with NPB's reported selling, general, and administrative expenses ("SG & A"). NPB reported SG & A for each model based on that model's cost of manufacture. The cost of manufacture included NPB's model-specific in-house labor and overhead costs, which the ITA had already rejected. While the ITA verified the accuracy of NPB's allocation methodology for SG & A, the ITA rejected NPB's reported SG & A because the underlying data had been rejected. *Id.*

As a result of the ITA's inability to verify NPB's model specific in-house labor costs, overhead and SG & A expenses, the ITA determined in the Preliminary Results that NPB had failed verification and decided to apply a BIA rate as NPB's dumping margin. *Preliminary Results,* 56 Fed.Reg. at 11,186.

During the rest of the administrative review, NPB contended that its in-house labor costs, overhead and SG & A had been successfully verified by the ITA. If, however, the ITA continued to find that NPB had failed verification, NPB argued that the use of BIA in this situation was not warranted, offered alternative methods for allocating in-house labor costs and overhead which the ITA rejected, and suggested that the ITA develop an allocation methodology on its own or use BIA only for model-specific in-house labor and overhead. AR Japan Pub.Docs. 791, 843.

Defendant-intervenors, The Torrington Company ("Torrington") and the Federal–Mogul Corporation ("Federal–Mogul"), submitted comments supporting the ITA's use of a BIA rate as NPB's dumping margin. AR Japan Pub.Docs. 857, 866.

In the Final Results of this administrative review, the ITA explained its use of total BIA for firms which cooperated in the review as follows:

> 2. When a company substantially cooperated with our requests for information including, in some cases, verification, but failed to provide the information requested in a timely manner or in the form required, we have used as BIA the higher of: (1) The firm's LTFV rate for the subject merchandise (or the "all others" rate from the LTFV investigation, if the firm was not individually investigated), or (2) the highest calculated rate in this review for the class or kind of merchandise from the same country of origin.

*Issues Appendix,* 56 Fed.Reg. at 31,705.

The ITA's explanation of its use and choice of a BIA rate for NPB's dumping margin deserves to be quoted at length:

> We disagree with NPB's contention that its basic labor, overhead, selling, general and administrative expense data were successfully verified. Although we were able to tie the aggregate labor, overhead and SG & A expenses from the monthly trial balance to the audited financial statements, we were not able to tie the reported model-specific amounts for these items to those internal accounting records and financial statements. Verification depends precisely on tying amounts reported in questionnaire responses to the company's internal accounting records and financial statements. Failure to demonstrate such a relationship results in a failed verification. In Valves [Certain Valves and Connectors of Brass for Use in Fire Protection Systems from Italy, 55 FR 50342 (1990)] and Salmon [Final Determination of Sales at Less Than Fair Value; Fresh and Chilled Atlantic Salmon from Norway, 56 FR 7661 (1991)] minor reallocations based on financial statement data were accepted because the respondents' questionnaire responses reconciled to the internal accounting records and financial statements. Unlike Valves and Salmon, and TRBs [Tapered Roller Bearings Four Inches or Less in Outside Diameter and Certain Components Thereof from Japan; Final Results of Antidumping Duty Administrative Review, 55 FR 38720, 38728 (1990)] and

Sweaters [Final Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man–Made Fibre from Taiwan, 55 FR 34585 (1990) ], where partial BIA was used to correct for minor omissions in the response, and Flowers [Certain Fresh Cut Flowers from Columbia; Final Results of Antidumping Duty Administrative Review, 55 FR 20491, 20494 (1990) ] where such minor omissions did not result in rejection of the entire response, NPB failed verification, in this case, verification of costs. In accordance with Department practice and policy, a failed verification is sufficient grounds for rejecting a response and resorting to BIA.

It is not the Department's policy to penalize respondents for not maintaining records in a manner that facilitates response to the antidumping questionnaire. When NPB explained its cost accounting system to the Department at verification, the Department attempted to work with NPB to devise an appropriate allocation methodology based on that system. However, due to problems addressed herein, the Department was unable to devise such an appropriate methodology at verification.

. . . .

The Department did attempt to make a more appropriate allocation for labor and overhead costs, but found that by doing so, it would have to ignore verified sub-contracting costs. . . . We consider it inappropriate to accept reallocated data, for purposes of analysis, if applying that revised data would result in rejection of verified information.

The alternate allocation methodology for labor and overhead costs proposed by NPB in its prehearing brief (aggregate labor and overhead expenses allocated across aggregate material and subcontracting costs) would result in an under- or over-allocation of these items. The Department learned, at verification, that production steps performed by subcontractors are not the same for all models; therefore, models with the highest subcontracting costs would be allocated higher portions of the labor and overhead costs.

In cases where the Department has accepted cost allocations based on aggregate data, it has done so because the costs involved bore some relationship to each other, or because such costs allocations were appropriate given the companies, internal cost accounting systems. . . . Here, some disaggregated records were kept by NPB . . . [but] the Department was unable to devise an appropriate allocation methodology.

. . . .

For the reasons discussed above, the Department was not able to conduct a test for sales below the cost of production. Thus, we were unable to use home market sales for comparison purposes. For the same reasons that NPB's data were unacceptable for the cost test, they were unacceptable for use in constructed value. Therefore, for this firm, we used as BIA the higher of the "all others" rate from the LTFV investigation or the highest weighted-average rate calculated for any individual firm in the instant review.

*Id.* at 31,707–08.

## Discussion

This Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■■ A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

Verification of information submitted by respondents and the use of BIA are governed by 19 U.S.C. § 1677e (1988) which states in relevant part:

**(b) Verification**

The administering authority shall verify all information relied upon in making—

. . . . .

(3) a review and determination under section 1675(a) of this title, if—

(A) verification is timely requested by an interested party . . ., and

(B) no verification was made under this paragraph during the 2 immediately preceding reviews and determinations under that section of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

. . . If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action. . . .

**(c) Determinations to be made on best information available**

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person *refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation,* use the best information otherwise available.

(Emphasis added); *see also* 19 C.F.R. §§ 353.36, 353.37 (1991).[2]

**2.** 19 C.F.R. § 353.36 states in relevant part:

**§ 353.36 Verification of information.**

(a) *In general.* (1) The Secretary will verify all factual information the Secretary relies on in: -

. . . . .

(iv) The final results of an administrative review under § 353.22(c) or (f) if the Secretary decides that good cause for verification exists; and

(v) The final results of an administrative review under § 353.22(c) if:

(A) An interested party . . . not later than 120 days after the date of publication of the notice of initiation of review, submits a written request for verification; and

(B) The Secretary conducted no verification under this paragraph during either of the two immediately preceding administrative reviews.

(2) If the Secretary decides that, because of the large number of producers and resellers included in an investigation or administrative review, it is impractical to verify relevant fac-

*1. Failure of cost verification and use of BIA*

NPB argues that all factual data supplied by NPB was verified by the ITA and that it is only NPB's allocation methodology for in-house labor and overhead which is questioned. *NPB's Memorandum* at 15–20; *Reply Memorandum* at 1–2; *see also Brief of Amicus Curiae Emerson Power Transmission Corporation in Support of Motion Under Rule 56.1 for Judgment Upon the Agency Record ("Emerson's Brief")* at 7–8. NPB argues that an allocation methodology is not factual information subject to verification. *NPB's Memorandum* at 34. NPB points out that its responses to the ITA's requests for information were submitted on time, were complete and that all of the factual data provided has been verified as accurate by the ITA. *Id.* at 33–34; *Emerson's Brief* at 7. As a result, NPB alleges that the ITA's determination that NPB failed the cost of production verification is incorrect. *NPB's Memorandum* at 33–34.

NPB also points out that the ITA used aggregate cost data from financial statements in this administrative review for certain respondents where their model-specific data could not be tied to their financial statements. *Id.* at 22–27. NPB argues that the ITA will use a respondent's costs as represented by the respondent's normal account-

tual information for each person, the Secretary may select and verify a sample.

19 C.F.R. § 353.37 states in relevant part:

**§ 353.37 Best information available.**

(a) *Use of best information available.* The Secretary will use the best information available whenever the Secretary:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

(b) *What is best information available.* The best information available may include the factual information submitted in support of the petition or subsequently submitted by interested parties. . . . If an interested party refuses to provide factual information requested by the Secretary or otherwise impedes the proceeding, the Secretary may take that into account in determining what is the best information available.

ing records unless these costs are shown to be wrong. In this case nothing in the administrative record shows that NPB's data is wrong or that its proposed allocation methodology provided incorrect results. Therefore, NPB argues that its data should have been used by the ITA. *Id.* at 26.

Further, NPB argues that the ITA's failure to develop an allocation methodology on its own to replace NPB's proposed methodology was not in accordance with law. In addition, NPB contends that the ITA should have considered the alternative methodologies proposed by NPB at the public hearing or should have requested NPB to segregate subcontracting costs in its computer response so that NPB's original allocation methodology could be corrected. *Id.* at 46–51. NPB points out that in the past the ITA has accepted allocation methodologies less precise than the ones proposed by NPB in this administrative review. *Id.* at 53–54.

In regard to the ITA's use and choice of total BIA, NPB argues that the ITA has a longstanding policy of not using total BIA when rejecting a respondent's allocation methodology but instead of developing an allocation methodology on its own which incorporates the respondent's verified factual information. *NPB's Memorandum* at 27–33; [3] *Emerson's Brief* at 10–14.

NPB also argues that the ITA was wrong to use BIA in this case because the information that the ITA asked for, model-specific in-house labor and overhead, did not exist. NPB contends that the ITA has been barred from using BIA in situations where the information requested does not exist. *NPB's*

*Memorandum* at 35–38 (*citing Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1573–74 (Fed.Cir.1990)); *Emerson's Brief* at 8–9.

NPB also suggests that the ITA could have used another respondent's data as BIA for model-specific in-house labor and overhead. *NPB's Memorandum* at 40–45.

Finally, NPB argues that the ITA's use of the "all others" rate from the LTFV investigation as BIA was not in accordance with law because such use was punitive citing *Olympic,* 899 F.2d at 1572. *Id.* at 70–78; *see Reply Memorandum* at 12–14; *Emerson's Brief* at 14–17.

In addition, amicus curiae Emerson Power Transmission Corporation ("Emerson") in support of the plaintiff argues that the ITA's use of an automatic two tiered BIA test for NPB is in direct conflict with the Court of Appeals for the Federal Circuit's holding in *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed.Cir.1990). Specifically, Emerson argues that *Rhone Poulenc* requires that the ITA obtain and *consider* recent data in its determination of what constitutes BIA but that in this case the automatic application of the ITA's two tiered system prevented the ITA from considering the most recent data in regard to its choice of BIA for NPB. *Supplemental Brief of Emerson Power Transmission Corporation* at 5.

Defendant argues that the ITA has broad discretion to use BIA in situations where a respondent does not produce information requested by the ITA, even if that information is difficult to produce. *Defendant's Memo-*

---

3. Some of the administrative determinations which NPB cites in support of its position include: *Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China* ("*Iron Construction Castings*"), 57 Fed.Reg. 10,-644, 10,647 (1992); *Notice of Final Results and Termination in Part of Antidumping Duty Administrative Review: 3.5" Microdisks and Coated Media Thereof From Japan* ("*Microdisks*"), 56 Fed. Reg. 58,040, 58,044 (1991); *Final Determination of Sales at Less Than Fair Value: Silicon Metal From Argentina* ("*Silicon Metal*"), 56 Fed.Reg. 37,891, 37,898 (1991); *Final Determination of Sales at Less Than Fair Value: Chrome–Plated Lug Nuts From Taiwan* ("*Lug Nuts*"), 56 Fed. Reg. 36,130, 36,132 (1991); *Certain Carbon Steel*

*Butt–Weld Pipe Fittings From Taiwan; Final Results of Antidumping Duty Administrative Review* ("*Butt–Weld Pipe Fittings*"), 56 Fed.Reg. 20,187, 20,188 (1991); *Preliminary Results of Antidumping Duty Administrative Review: Certain Valves and Connections, of Brass, for Use in Fire Protection Systems from Italy* ("*Fire Protection Systems*"), 55 Fed.Reg. 50,342, 50,343 (1990); *Final Results of Antidumping Duty Administrative Review: Roller Chain, Other than Bicycle, From Japan* ("*Roller Chain*"), 55 Fed.Reg. 42,602, 42,-603 (1990); *Final Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man–Made Fiber From Taiwan* ("*Sweaters*"), 55 Fed.Reg. 34,585, 34,587, 34,-589–91 (1990).

*randum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Memorandum")* at 14. In this case, defendant and Torrington argue that the ITA was unable to verify the accuracy of NPB's allocation methodology and was unable to tie NPB's reported model-specific in-house labor and overhead costs produced by this methodology to NPB's internal accounting records and financial statements. *Id.* at 15–18; *The Torrington Company's Response to Plaintiff's Motion for Judgment on the Agency Record ("Torrington's Response")* at 18–20.

Defendant and Torrington argue that the ITA is not required to reconstruct a respondent's questionnaire response to meet ITA's requirements by providing an alternative allocation methodology where a respondent's proposed methodology has been rejected by the ITA. *Defendant's Memorandum* at 19–20; *Torrington's Response* at 21–22. Even so, in this case the ITA did attempt to develop an alternative methodology in concert with NPB but was unable to do so. *Defendant's Memorandum* at 21.

In addition, the ITA found that the alternative methodologies proposed by NPB would have either required the ITA to ignore verified information, perpetuated the original problem with NPB's methodology by continuing to rely on subcontracting costs in allocating in-house labor and overhead or were based on the existence of a relationship between the cost of materials and in-house labor for each AFB model which was not shown to exist. *Id.* at 22–28; *Federal–Mogul Corporation's Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Federal–Mogul's Opposition")* at 21–23.

Defendant argues that NPB's reliance on *Olympic Adhesives,* 899 F.2d 1565, is misplaced because, unlike the respondent in *Olympic,* NPB did have the information requested by the ITA even though it was in aggregate form. It was NPB's choice of allocation methodology which forced the ITA to resort to BIA, not the non-existence of the information requested and, therefore, *Olympic* does not apply in this case. *Defendant's Memorandum* at 29–30.

Defendant and Torrington argue that since the ITA correctly determined that NPB failed verification, the ITA was required to resort to BIA and that the ITA enjoys broad discretion in its choice of BIA. *Id.* at 36–39 (*citing Rhone Poulenc,* 899 F.2d at 1190–91; *N.A.R., S.p.A. v. United States,* 14 CIT 409, 416, 741 F.Supp. 936, 942 (1990); *Chemical Prods. Corp. v. United States,* 10 CIT 626, 633–34, 645 F.Supp. 289, 295, *remand order vacated,* 10 CIT 819, 651 F.Supp. 1449 (1986)); *Torrington's Response* at 22.

Defendant also argues that the use of partial BIA to substitute for NPB's missing model-specific in-house labor and overhead expenses would have been contrary to prior court rulings and administrative practice. Defendant argues that partial BIA is used only in situations where very limited amounts of information are missing or incorrect or in a situation where another party not under the respondent's control refuses to provide information requested by the ITA. Defendant alleges that neither situation applies here. *Defendant's Memorandum* at 41–42. Defendant states that NPB's failure to substantiate its allocation methodology for in-house labor and overhead made its entire cost response unusable requiring the use of total BIA. *Id.* at 42–43; *cf. Federal–Mogul's Opposition* at 25–27.

Defendant, Torrington and Federal–Mogul argue that the ITA's choice of total BIA was reasonable and in accordance with law. Defendant, Torrington and Federal–Mogul point out that the ITA treats the BIA provision as embodying a rule of reasonable adverse inference, i.e., that compliance with the ITA's information request would have been more adverse to the respondent than noncompliance. *Defendant's Memorandum* at 44 (*citing Rhone Poulenc,* 899 F.2d at 1188–91); *Torrington's Response* at 22–25; *Federal–Mogul's Opposition* at 27–29. In assigning the "all others" rate which was NPB's rate from the underlying less than fair value investigation, the ITA ensured that NPB was not better off due to its noncompliance with the ITA's information request and encouraged NPB to cooperate fully with the ITA in future reviews. *Defendant's Memorandum* at 44–45. In addition, the ITA recognized

NPB's attempt to cooperate with the ITA by assigning NPB the lower or "second tier" BIA rate used for cooperating respondents. *Defendant's Memorandum* at 45–46; *Torrington's Response* at 25–27. Defendant points out that NPB's argument that the BIA used should be based on the most current accurate information was specifically rejected by the Court of Appeals for the Federal Circuit in *Rhone Poulenc,* 899 F.2d at 1190. *Defendant's Response* at 46.

Finally, Federal–Mogul points out that NPB could have used one of the allocation methodologies used by the other respondents but chose not to do so. *Federal–Mogul's Opposition* at 18–21.

In reviewing the ITA's decision to resort to the use of BIA, this Court examines two distinct aspects of that decision. The first aspect of the decision to be examined is whether there is substantial evidence on the administrative record of non-compliance by a respondent with an information request from the ITA which supports the ITA's resort to the use of total or partial BIA and whether the respondent was put on notice that failure to comply with the ITA's information request would result in the use of adverse BIA. This entails an examination of the facts and administrative record of each case to determine if the ITA's actions are reasonable based upon the evidence in the administrative record and to determine if the respondent was put on notice.

■ If the court finds that the ITA's decision to resort to total or partial BIA is supported by substantial evidence on the administrative record and in accordance with law, the court must then determine if the ITA's choice of BIA accomplishes the purposes of the BIA rule as interpreted by the Court of Appeals for the Federal Circuit in *Rhone Poulenc* which is to induce respondents to provide the ITA with the information that it has requested in a timely, complete and accurate manner so that the ITA may "determin[e] current margins as accurately as possible" within the statutory deadlines. 899 F.2d at 1190–91. In order to accomplish this purpose, in situations where the ITA uses BIA as the partial or total dumping margin, the ITA makes a rebuttable

presumption "that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less." *Id.* at 1190 (emphasis in original).

■ Using the framework of analysis outlined above, this Court finds that substantial evidence on the administrative record supports the ITA's concerns with regard to NPB's proposed allocation methodology for model-specific in-house labor and overhead. An allocation methodology is part of the factual information submitted by a respondent which is subject to verification pursuant to 19 U.S.C. § 1677e(b) and failure to verify submitted information justifies the ITA's resort to the use of BIA. *Florex v. United States,* 13 CIT 28, 33, 705 F.Supp. 582, 588 (1989).

In this case, use of NPB's proposed methodology could lead to over- or under-allocation of model-specific in-house labor and overhead because under this methodology AFBs with greater subcontracting expenses would receive proportionately more in-house labor and overhead expense. This would be acceptable if the types of production steps done by subcontractors were the same for all AFB models, but upon verification the ITA discovered that they were not. AR Japan Pub.Doc. 658.

■ Given that NPB's reported model-specific in-house labor and overhead expenses were correctly rejected by the ITA as not verified, it was also necessary for the ITA to reject NPB's reported SG & A since this amount was derived from a cost of manufacture which included the erroneous in-house labor and overhead expenses. *Id.* However, it bears repeating that the ITA's problem was only with the proposed allocation methodology and not with the underlying data which was successfully verified. *Id.*

■ NPB argued in its *Reply Memorandum* and stated at oral argument that the same production steps were done by subcontractors for all unhoused AFB models which were produced during the period of review. As a result, NPB argues that the ITA's

concerns in regard to NPB's proposed allocation methodology do not exist for NPB's unhoused AFBs. Therefore, at a minimum, the ITA should be required to accept NPB's cost submission in regard to unhoused AFBs and use it instead of BIA to calculate dumping margins for unhoused AFBs. *Reply Memorandum* at 10–11; Transcript of Oral Argument (Nov. 13, 1992) at 12–15.

However, this Court can find no evidence in the administrative record that this argument was presented to the ITA during the administrative proceeding below. In fact, NPB does not even raise this argument before this Court until its reply brief. Therefore, this Court refuses to consider this argument. 28 U.S.C. § 2637(d) (1988); *Sharp Elecs. Corp. v. United States*, 13 CIT 732, 736, 720 F.Supp. 1014, 1017 (1989); *Matsushita Elec. Indus. Co. v. United States*, 12 CIT 455, 461–62, 688 F.Supp. 617, 622 (1988); *Cementos Guadalajara, S.A. v. United States*, 12 CIT 307, 330, 686 F.Supp. 335, 352–53 (1988), *aff'd*, 879 F.2d 847 (Fed.Cir. 1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).

▪ Having found that NPB had failed the cost verification in regard to the allocation methodology for model-specific in-house labor and overhead and by extension for SG & A, the ITA was required by 19 U.S.C. § 1677e(b) to resort to the use of BIA. The central question in this case is whether the ITA's decision to reject all of NPB's cost submission and use total BIA, instead of using partial BIA by applying its own allocation methodology or using another similarly situated respondent's allocation methodology, was supported by substantial evidence on the administrative record and in accordance with law.

In this case, this Court finds that the ITA's resort to total BIA is not supported by substantial evidence on the administrative record or by the ITA's past practice in similar cases.

After close examination of the administrative record in this case, the only explanation this Court can find relating to the ITA's decision not to use partial BIA and to resort to total BIA is in the *Issues Appendix* which states:

Although we were able to tie the aggregate labor, overhead and SG & A expenses from the monthly trial balance to the audited financial statements, we were not able to tie the reported model-specific amounts for these items to those internal accounting records and financial statements. Verification depends precisely on tying amounts reported in questionnaire responses to the company's internal accounting records and financial statements. Failure to demonstrate such a relationship results in a failed verification. In Valves [Certain Valves and Connectors of Brass for Use in Fire Protection Systems from Italy, 55 FR 50342 (1990) ] and Salmon [Final Determination of Sales at Less Than Fair Value; Fresh and Chilled Atlantic Salmon from Norway, 56 FR 7661 (1991) ] minor reallocations based on financial statement data were accepted because the respondents' questionnaire responses reconciled to the internal accounting records and financial statements. Unlike Valves and Salmon, and TRBs [Tapered Roller Bearings Four Inches or Less in Outside Diameter and Certain Components Thereof from Japan; Final Results of Antidumping Duty Administrative Review, 55 FR 38720, 38728 (1990) ] and Sweaters [Final Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man-Made Fibre from Taiwan, 55 FR 34585 (1990) ], where partial BIA was used to correct for minor omissions in the response, and Flowers [Certain Fresh Cut Flowers from Columbia; Final Results of Antidumping Duty Administrative Review, 55 FR 20491, 20494 (1990) ] where such minor omissions did not result in rejection of the entire response, NPB failed verification, in this case, verification of costs. In accordance with Department practice and policy, a failed verification is sufficient grounds for rejecting a response and resorting to BIA.

56 Fed.Reg. at 31,707.

Nowhere in this discussion or anywhere else in the administrative record can the Court find an explanation as to why the ITA believes that NPB's failure to provide an acceptable allocation methodology in this

case is a major omission given the ITA's past administrative practice in similar situations of using partial BIA.

In the past this Court has upheld the use of total BIA by the ITA in situations where the ITA was unable to verify major portions of the information submitted by a respondent. *Chinsung Indus. Co. v. United States,* 13 CIT 103, 106–07, 705 F.Supp. 598, 601–02 (1989); *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 406, 636 F.Supp. 961, 967 (1986). However, in this case the ITA was unable to verify only NPB's proposed allocation methodology for in-house labor and overhead. This was not a case where a respondent's questionnaire responses "contained numerous omissions, allocation errors, oversights and miscalculations." *Chinsung,* 13 CIT at 106, 705 F.Supp. at 601. In addition, in the past the ITA had a consistent administrative practice of using partial BIA in situations where the ITA rejected a respondent's allocation methodology.

For instance, in *Butt–Weld Pipe Fittings,* the ITA used its own methodology as BIA for reallocating company-wide direct labor and factory overhead. 56 Fed.Reg. at 20,-188. In *Silicon Metal,* the ITA rejected the respondent's proposed allocation methodology for factory overhead and used as BIA a different methodology proposed by the petitioner in that proceeding. 56 Fed.Reg. at 37,898. In *Sweaters,* the ITA rejected various respondents' methods of allocating general and administrative expenses, interest expenses and home market selling expenses over cost of manufacturing and reallocated these expenses over cost of sales. 55 Fed. Reg. at 34,589–91, 34,595–99. *See, e.g., Microdisks,* 56 Fed.Reg. at 58,044 (ITA used "as BIA the ratio of Memorex's general and administrative expenses to cost of sales as reported on its financial statements and applied this ratio to the reported COM"); *Lug Nuts,* 56 Fed.Reg. at 36,132 (ITA rejected respondent's proposed allocation methodology for labor costs and used its own).

The ITA's justification for rejecting NPB's entire submission because it was unable to tie NPB's "reported model-specific amounts for these items to ... internal accounting records and financial statements" is mislead-ing because if NPB's allocation methodology was inaccurate, then by necessity the reported figures derived from that methodology would be inaccurate and incapable of being tied to the records. *Issues Appendix,* 56 Fed.Reg. at 31,707.

In addition, throughout the administrative review, the ITA determined that NPB was fully cooperating and that all the information requested by the ITA had been submitted on time and was accurate with the exception of the allocation methodology. The ITA's *Preliminary Results* stated "because of the level of cooperation exhibited by company officials at verification and because the company's response and verification were otherwise adequate, we are not using the most adverse BIA." 56 Fed.Reg. at 11,186; *see also Issues Appendix,* 56 Fed.Reg. at 31,705; AR Japan Pub.Doc. 744.

The purpose underlying the ITA's use of the BIA rule is to encourage respondents to provide the ITA with the information that it has requested in a timely, complete and accurate manner so that the ITA may "determin[e] current margins as accurately as possible" within the statutory deadlines. *Rhone Poulenc,* 899 F.2d at 1190–91. However, this purpose can be undermined when, as here, the ITA uses total BIA for a respondent who has cooperated in every way but is unable to provide the ITA with an acceptable allocation methodology due to the way it keeps its business records.

Given the lack of evidence in the administrative record explaining why the ITA determined that, contrary to past administrative practice, rejection of an allocation methodology constituted a complete failure of verification when all other information supplied was verified and that such a failure of verification justified resort to total BIA, coupled with the admitted complete cooperation of the respondent in all phases of this administrative review, this Court finds that the ITA's use of total BIA for NPB was not supported by substantial evidence on the administrative record. Therefore, this case is remanded to the ITA to further explain why the ITA chose to ignore its past administrative practice of supplying its own allocation methodology in similar situations, or of using the

allocation methodology of another respondent whose method of record keeping was similar to NPB's, as partial BIA for NPB's model-specific in-house labor and overhead.

### 2. *Comparison of sales of dissimilar quantities*

If the Court decides to remand this case back to the ITA, NPB requests that this Court order the ITA not to compare sales of dissimilar quantities of AFBs when comparing home market and U.S. sales. *NPB's Memorandum* at 89–92.

Defendant, Torrington and Federal–Mogul argue that this issue is not ripe for review because as yet the ITA has made no comparisons of any of NPB's home market and U.S. sales. *Defendant's Memorandum* at 47–48; *Torrington's Response* at 33–36; *Federal–Mogul's Opposition* at 29–31.

This court has stated that the administering agency must have the first opportunity to address an issue before it will be reviewed by this court. 28 U.S.C. § 2637(d); *Sharp Elecs.*, 13 CIT at 736, 720 F.Supp. at 1017; *Matsushita Elec.*, 12 CIT at 461–62, 688 F.Supp. at 622; *Cementos Guadalajara*, 12 CIT at 330, 686 F.Supp. at 352–53. As this issue has not yet been addressed by the ITA, this Court declines to deal with it at this time.

### *Conclusion*

This case is remanded to the ITA to further explain why the ITA chose to ignore its past administrative practice of supplying its own allocation methodology in similar situations, or of using the allocation methodology of another respondent whose method of record keeping was similar to NPB's, as partial BIA for NPB's model-specific in-house labor and overhead. The ITA will report the results of this remand to this Court within thirty (30) days of the date this opinion is entered. Comments or responses by the parties to the remand results are due within thirty (30) days thereafter and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("ITA"), to further explain why the ITA chose to ignore its past administrative practice of supplying its own allocation methodology in similar situations, or of using the allocation methodology of another respondent whose method of record keeping was similar to NPB's, as partial BIA for NPB's model-specific in-house labor and overhead; and it is further

**ORDERED** that the ITA will report the results of this remand to this Court within thirty (30) days of the date this opinion is entered; comments or responses by the parties to the remand results are due within thirty (30) days thereafter; and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.