TATUNG CO., ET AL., PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 90–12–00649

(Dated December 14, 1994)

*White & Case (William J. Clinton, Christopher Curran* and *David E. Bond)* for plaintiff Tatung Company and for defendant-intervenors AOC International, Proton Electronic Industrial Co., Ltd.

*Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Joseph A. Perna, V* and *Larry Hampel)* for plaintiff Zenith Electronics Corporation.

*Collier, Shannon, Rill & Scott (Paul D. Cullen, Jeffrey S. Beckington, Mary T. Staley* and *David C. Smith)* for plaintiffs United Electrical Workers of America, Independent; the International Brotherhood of Electrical Workers; the International Union of Electronic, Electrical, Technical, Salaried, Machine and Furniture Workers (AFL-CIO); and the Industrial Union Department (AFL-CIO).

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Velta A. Melnbrencis), Thomas H. Fine,* Attorney Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

## OPINION

RESTANI, *Judge:* This matter is before the court on separate motions for judgment on the agency record pursuant to USCIT Rule 56.2. Tatung Company ("Tatung"), Zenith Electronics Corp. ("Zenith"), and the United Electrical Workers of America, Independent, the International Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried, Machine and Furniture Workers (AFL-CIO), and the Industrial Union Department (AFL-CIO) ("the Unions"), challenge the final determination of the antidumping duty order in *Color Television Receivers, Except for Video Monitors, from Taiwan,* 55 Fed. Reg. 47,093 (Dep't Comm. 1990). AOC International, Proton Electronic Industrial Company, Ltd., and Tatung (collectively "AOC") oppose Zenith's and the Union's motions for judgment on the agency record.[1] The issues presented are: 1/ whether the International Trade Administration of the Department of Commerce ("Commerce") should have applied best information available ("BIA") to Tatung, and if so, whether the type of BIA applied was correct; 2/ whether Commerce's adjustments to United States price ("USP") and foreign market value ("FMV") for value added taxes ("VAT") forgiven were proper; 3/ whether Commerce erred in failing to adjust USP for actual antidumping duties paid; and 4/ whether Commerce erred in revoking the antidumping duty order with respect to Capetronic (BSR) Ltd. ("Capetronic").

## BACKGROUND

On April 30, 1984, Commerce issued an antidumping duty order covering color television receivers ("CTVs") from Taiwan. *Color Television*

---

[1] Pursuant to USCIT Rules 1 and 12(f), AOC also filed a motion to strike portions of Zenith's reply brief in this matter. The court denied this motion on November 4, 1994.

*Receivers, Other Than Video Monitors, from Taiwan,* 49 Fed. Reg. 18,337, 18,337–38 (Dep't Comm. 1984) (antidumping duty order). In April 1987, Commerce received requests to conduct the third administrative review of that order, and on May 20, 1987, it initiated a review of entries of several Taiwanese manufacturers, including Tatung, for the period April 1, 1986 through March 31, 1987. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 52 Fed. Reg. 18,937, 18,937 (Dep't Comm. 1987).

Tatung answered Commerce's antidumping questionnaire in August 1987. In November 1987, Commerce notified Tatung by letter that on December 9 and 10, 1987, it would conduct a verification of the data submitted, pursuant to 19 U.S.C. §1677e(a) (Supp. III 1985). It also sent Tatung an outline of the verification procedure, and put Tatung on notice that Commerce could request other information during verification. The outline referred to six individual sales, out of all of the sales data submitted, that would be traced to Tatung's books. At verification, Commerce selected at random two invoices to examine as well. In addition, Commerce reviewed data relating to discounts and to U.S. sales expenses.

Commerce officials found numerous errors and omissions in Tatung's data at verification. In particular, Commerce discovered an omitted U.S. sale and an overstated unit price for fifteen CTVs to be sold in the United States market. Commerce also found two errors in Tatung's reported sales commissions. Further, Commerce found Tatung's methodology for calculating ocean freight costs and brokerage and handling costs per model for a 40-foot container to be in error, noting that "it failed to account for containers which held a mix of products." Tatung's Br. Supp. Mot. J. Agency R., App. at Reel 13, Frames 374–75, 4–5, Conf. Doc. 113 (Mem. from Commerce dated Jan. 22, 1988 regarding verification of Tatung's response). Tatung revised this methodology at the request of Commerce, and Commerce verified the adjusted figures. *Id.* at Frame 374, 4.

During preparations for verification, Tatung found mistakes in its submission concerning both credit and advertising expenses. Tatung revised these figures and submitted them to Commerce. At verification, Commerce noted that it "[was] able to reconcile [the credit expenses] with the total Operating Expense," and that it "[was] able to tie the monthly General Ledger totals [for advertising] back to the expenses reported in the General Ledger with no discrepancies." *Id.* at Reel 13, Frame 378, 380, 8, 10. It is unclear whether the individual unit prices, reflecting these and other corrections, could be verified in the same manner as they would have been if the questionnaire responses were accurate.

After verification, Tatung discovered two additional sales invoices that it had omitted from its questionnaire response. Tatung submitted these invoices, as well as a revised sales listing, to Commerce and requested that Commerce verify the corrected information during its

then upcoming visit to Tatung's office. This visit was scheduled for the purpose of conducting the verification of information submitted for the fifth administrative review. Commerce declined this request due to its limited resources.

Commerce published the final results of the third review on November 9, 1990. 55 Fed. Reg. 47,093. Commerce ultimately concluded that "Tatung's data were unreliable" because of the serious nature of the errors found. *Id.* at 47,101. Thus, Commerce disregarded all of Tatung's information and assigned to Tatung the highest dumping margin for any respondent in the review, 4.44%, as its BIA rate. *Id.*

As to other issues, Commerce also noted that for all respondents, "the amount of the commodity tax forgiven by reason of the export of televisions to the United States must be added to USP under the statute [19 U.S.C. § 1677a(d)(1)(C) (1988)]." *Id.* at 47,094. Commerce then calculated the adjustment to USP for taxes forgiven upon export by "multiplying the U.S. tax base by the home market tax rate and adding the result to USP," but Commerce made a further adjustment to FMV under the circumstance of sale provision for differences in the tax amounts. *Id.; see* 19 U.S.C. § 1677b(a)(4)(B) (1988).

Commerce further concluded that "[l]ike legal fees, we do not consider antidumping duties to be expenses related to sales under consideration," therefore Commerce declined to adjust for estimated duties paid by the respondents. 55 Fed. Reg. at 47,095. The issue of actual duties was not raised or addressed.

On May 23, 1990, Commerce announced that it intended to revoke the antidumping duty order against Capetronic, citing a lack of margins for the period October 19, 1983 through March 31, 1986, and finding sales at "not less than fair value" for the period April 1, 1986 through May 29, 1987. *Color Television Receivers, Except for Video Monitors, from Taiwan,* 55 Fed. Reg. 21,210, 21,212 (Dep't Comm. 1990) (prelim. results and intent to revoke in part). On November 9, 1990, Commerce finalized its determination to revoke the antidumping duty order with respect to Capetronic. 55 Fed. Reg. at 47,097.

Tatung alleges in its motion that Commerce erred in rejecting the post-verification sales data and revised methodologies it submitted and in relying instead on BIA to calculate its dumping margin. In the alternative, Tatung argues that if the use of BIA were warranted, Commerce should not have applied "total" BIA, as Tatung was a cooperative respondent.

Zenith and the Unions contend in their motions that (1) Commerce erred in the calculation of FMV and USP by failing to account properly for taxes forgiven by Taiwan due to the exportation of merchandise; (2) Commerce failed to account for antidumping duties already paid in its calculation of exporter's sale price ("ESP") and (3) Commerce erred in its decision to revoke the antidumping duty order with respect to Capetronic. AOC opposes Zenith's motion, and with respect to the adjustment for taxes forgiven, requests that the court remand the case

to Commerce for a re-calculation of the adjustment in accordance with the Federal Circuit's decision in *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573 (Fed. Cir. 1993).

STANDARD OF REVIEW

Upon review of a final determination of an administrative review, the court must determine whether the decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d. 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

DISCUSSION

I. *Applicability of BIA:*

Commerce is required to verify the information upon which it relied in making its final determination. 19 U.S.C. § 1677e(a)(1) (Supp. III 1985) (subsequently redesignated as 19 U.S.C. § 1677e(b)(1) (1988)); *see also* 19 C.F.R. § 353.51(a) (1987). When Commerce "is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action." 19 U.S.C. § 1677e(a). The regulations similarly provide for the use of BIA where (1) the response received is incomplete, inaccurate, or not timely submitted, or (2) Commerce is unable to satisfactorily verify the accuracy of the submission. 19 C.F.R. § 353.51.

Tatung admits that its submission contained errors as to commissions, U.S. sales expenses, and an overstated unit price. Tatung also admits that it failed to report other U.S. sales in addition to the missing sale identified by Commerce at verification. Tatung argues that these omissions were minor errors that only amounted to a small fraction of its U.S. sales. Tatung further contends that Commerce did not apply BIA to another respondent, Philips Consumer Electronics Corp. ("Philips"), whose submission contained more errors. Thus, Tatung asserts that Commerce's application of BIA to Tatung is unwarranted.

Tatung's argument misconstrues the purpose of the verification procedure. "[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness," so that Commerce can justifiably rely upon that information. *Bomont Indus. v. United States,* 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990) . Commerce is not required to verify every sale and invoice submitted, thus Tatung "cannot expect Commerce to be a surrogate to guarantee all of [its] submissions are correct." *Sugiyama Chain Co. v. United States,* 16 CIT 526, 532, 797 F. Supp. 989, 995 (1992). The burden of creating an adequate record rests with Tatung. *Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F. Supp. 598, 601 (1989). Due to stringent time deadlines and the significant limitations on Commerce's resources, "it is vital that accurate information be provided promptly to allow the

agency sufficient time for review." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 406, 636 F. Supp. 961, 967 (1986) (citation omitted), *aff'd,* 810 F.2d 1137 (1987).

It is evident from the record that Tatung was able to find errors and omissions in other areas of its submission, therefore Tatung should have been able to discover the missing sales and commissions as well. Tatung was "in the best position to organize [its] own sales * * * data and *prepare, check, and verify* the information [it] supplied to Commerce; Commerce was not privy to the private business affairs of [Tatung]." *Sugiyama Chain,* 16 CIT at 530–31, 797 F. Supp. at 994 (emphasis added).

Commerce considers the omission of U.S. sales to be a serious error, as does the court. Overstating U.S. price is also a serious matter. *See Florex v. United States,* 13 CIT 28, 32–33, 705 F. Supp. 582, 588 (1989) (finding BIA reasonable where one U.S. sale missing and nearly half of home market sales reviewed contained errors in price, quantity or grade). Depending on whether they are isolated events, or not, other errors may be serious.

Regarding Tatung's argument that Commerce found more instances of error in Philips' data, the issue is not the value of the errors as a percentage of total U.S. sales, or the number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission. Commerce explains that Philips' errors were of a different nature than Tatung's, noting that, for example, while Philips did omit some U.S. sales, these sales were discounted sales to employees, and were less indicative of general unreliability than omitted open market. That is, Philips might have considered the sales unrepresentative or outside the ordinary course of business.[2] Also, Philips discovered and corrected most of its errors before verification. The distinction between errors found by *Commerce* at verification (as with Tatung), and errors found and corrected by a *respondent* before verification (as with Philips), may be significant, although reporting errors after the verification outline has been received is less exculpatory. Where Commerce discovers a respondent's errors at verification, it is forced to divert its resources from conducting the verification as planned.

In any case, whether Commerce treated Philips properly is not the issue, as perhaps both Philip and Tatung should have received BIA, an eventuality that does not aid Tatung here. As Commerce indicated, some of Tatung's errors were fundamental and others affected almost every sale. 55 Fed. Reg. at 47,101. Further, although Tatung corrected some of the errors during verification and others in post-verification submissions, these re-submissions do not ensure the overall accuracy of

---

[2] This, of course, is not an appropriate reason for not reporting U.S. sales.

Tatung's original response.[3] For these reasons, the court finds that there is substantial evidence in the record to support Commerce's conclusion that Tatung's submission was unreliable, requiring the use of BIA.

## II. *Choice of "Total" BIA:*

Tatung argues in the alternative that if the use of BIA was appropriate, then the use of "total" BIA was unwarranted, as Commerce is precluded from applying "total" BIA to a cooperative respondent. Tatung argues that, at most, Commerce should have applied "partial" BIA to replace the missing sales data. Commerce responds that because the errors found affected nearly every transaction, the entire submission was unreliable and the application of "total" BIA was justified.

Commerce applies two types of BIA, "partial" BIA, which is used when the respondent's submission is deficient in limited respects, but Commerce considers the submission as a whole to be reliable; and "total" BIA, which is used for the respondent whose submission contains fundamental errors that render the entire submission unreliable. *See Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* Slip Op. 94–151, at 19 n.21 (Sept. 26, 1994). When choosing a BIA rate, Commerce employs a two-tier methodology that considers the cooperation of the respondent as a factor.[4] *See Allied-Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1190–91 (Fed. Cir. 1993).

Contrary to Tatung's assertion, Commerce has applied "total" BIA to cooperative respondents. *See id.* (directing Commerce to apply "second tier" BIA to cooperative company able only to supply simplified data as result of costing system and limited accounting resources); *Persico Pizzamiglio v. United States,* Slip Op. 94–61, at 20 (Apr. 14, 1994) (finding "[a] plain reading of the statute [19 U.S.C. S 1677e(b) & (c) (1988)] demonstrates that BIA can be used against a cooperative respondent"). To support its argument, Tatung incorrectly relies upon dicta from the court's decision in *Nippon Pillow Block Sales Co. v. United States,* 820 F. Supp. 1444 (Ct. Int'l Trade 1993). The court in *Nippon Pillow Block* rejected the use of "total" BIA where Commerce disagreed only with respect to an allocation methodology of the respondent, and the respondent's submission was otherwise acceptable. *Id.* at 1454–55. Unlike the

---

[3] Commerce is not required to re-verify information submitted after verification, or recalculate a respondent's submission to develop an accurate response. *See Chinsung,* 13 CIT at 106–07, 705 F. Supp. at 601–02 (holding that Commerce can reject entire submission and apply BIA even when only portions are inadequate). The court accepts as reasonable Commerce's position that allowing respondents who failed verification to resubmit new data, and requiring Commerce to re-verify this information, would impose an undue burden on Commerce. *See Photo Albums and Filler Pages from Korea,* 50 Fed. Reg. 43,754, 43,755 (Dep't comm. 1985) (final) (explaining burden that would be placed on Commerce if required to reverify and reconstruct submissions).

[4] According to this "two-tier" policy, respondents who cooperate with Commerce's requests for information but fail verification are subject to "second tier" BIA. *Allied-Signal Aerospace Co., v. United States,* 996 F.2d 1185, 1191. Under the "second tier", Commerce applies either the highest of the respondent's less than fair value ("LTFV") margins for any prior review, or the highest rate of any respondent calculated in the current review. *Id.* Here, Commerce used the highest rate for any shipper in the review period. This methodology substantially complies with Commerce's previous practice of assigning "the highest margin determined for any of the respondents to * * * verification failing [ ] producers," *Florex,* 13 CIT at 33, 705 F. Supp. at 589.

case at bar, *Nippon Pillow Block* "was not a case where a respondent's questionnaire responses 'contained numerous omissions, allocation errors, oversights and miscalculations'" that would justify the resort to "total" BIA. *Id.* at 1455 (quoting *Chinsung,* 13 CIT at 106, 705 F. Supp. at 601).

Here, Tatung's omissions found during verification were not isolated, and included unreported and overstated U.S. sales. "Capture of all U.S. sales at their actual price is at the heart of [Commerce's] investigation." *Florex,* 13 CIT at 33, 705 F. Supp. at 588. Further, Commerce found problems with allocated adjustments to USP for ocean freight, brokerage and handling, credit expenses, advertising expenses and general administrative expenses that affected nearly every sale. Use of BIA in this situation is a judgment call. Commerce's conclusion that Tatung's entire submission was unreliable, and that it should apply "total" BIA, is not unreasonable.

Requiring Commerce to use BIA for only those segments of a submission that are rejected could permit a party such as Tatung to select the data it believed would be to its benefit, leaving Commerce only to fill in the blanks. *Chinsung,* 13 CIT at 106, 705 F. Supp. at 601. Because commerce determined that the information provided by Tatung was inaccurate in important respects, it was not obligated to use any portion of the submission that had not been proven inaccurate. *Ceramica,* 10 CIT at 406, 636 F. Supp. at 967; *see also Chinsung,* 13 CIT at 106, 705 F. Supp. at 601. The court therefore finds that Commerce's choice of "total" BIA is supported by substantial evidence in the record and is otherwise in accordance with the law.

III. *Adjustments for VAT and Actual Antidumping Duties Paid:*

Zenith raises three claims in its motion. The first two are easily resolved based upon recent decisions of the court. Accordingly, this matter is remanded for recalculation of the value-added tax adjustment according to Commerce's new methodology. *See Independent Radionic Workers v. United States,* 862 F. Supp. 422, 426 (Ct. Int'l Trade 1994). As to adjustments to USP for actual antidumping duties paid, plaintiffs have failed to exhaust their administrative remedies. *See Zenith Elecs. Corp. v. United States,* Slip Op. 94–146, at 4–6 (Sept. 19, 1994).

IV. *Revocation of Capetronic's Antidumping Duty Order:*

Zenith's third claim is that Commerce improperly revoked the antidumping duty order as to Capetronic. Zenith asserts that Commerce should not have revoked the order because, contrary to the notice of intent to revoke, Capetronic did not have three consecutive years during which there were no duties or duties were *de minimis,* and because dumping was likely to resume. *See Color Television Receivers,* 55 Fed. Reg. at 21,212; *see also* 19 C.F.R. § 353.25(a)(2) (1990) (requirements for revocation).

First, Zenith argues that because the value of Taiwanese currency from 1987 to 1990 appreciated *vis-à-vis* the U.S. dollar, Capetronic's

more recent USPs would fall, and its home market costs and calculated home market value would rise, likely causing an increase in margins. Commerce responded that for three years Capetronic had successfully adjusted for such appreciation. Thus, Commerce expected such adjustment to continue in the future. 55 Fed. Reg. at 47,097. The second requirement for revocation, that the respondent is not likely to resume dumping, necessarily involves an exercise of discretion and judgment. Predicting future behavior is not an easy task. Ordinarily, past behavior would constitute substantial evidence of expected future behavior. Thus, this is not a sustainable basis for reinstatement of the order as to Capetronic.

Second, Zenith asserts that Commerce's calculations were erroneous and that Commerce knew on the date of the final results and revocation, November 9, 1990, that a genuine dispute existed as to Capetronic's margins. In fact, in *Zenith Elecs. Corp. v. United States,* 15 CIT 394, 407–08, 770 F. Supp. 648, 659–60 (1991) *("Zenith I"),* the court found Capetronic's first year margin calculations to be erroneous and remanded the matter to Commerce. Remand results showing a positive margin were issued by Commerce on January 31, 1992. Final judgment was entered on October 21, 1994, affirming those results. *Zenith Elecs. Corp. v. United States,* Slip Op. 94–170 (Oct. 21, 1994) *("Zenith II").* Whatever the state of the record at the time of the final determination, Commerce agrees with Zenith that the court may consider a post-determination change to a positive margin for the purpose of reviewing a decision to revoke.[5] See Response of the United States to Questions Raised by the Court's Letter of Sept. 30, 1994, at 2. The only dispute is at what point in the proceedings of the parallel case may the court consider the change.

According to Commerce, the revocation of the antidumping duty order is not subject to recision until there is no further opportunity for appeal in *Zenith II. See* 19 U.S.C. § 1516a(e) (1988).[6] In *NTN Bearing Corp. v. United States,* 892 F.2d 1004, 1006 n.4 (Fed. Cir. 1989), which involved a proceeding that was not final in the CIT, the Federal Circuit left unresolved the issue of when this court's judgments are 11final" for the purposes of § 1516a(e). In holding that a final appealable CIT judgment may result in suspension of liquidation, the Court of Appeals in *Timken Co. v. United States,* 893 F.2d 337, 339–40, 342 (Fed. Cir. 1990), however, did opine that § 1516a(e) does not require actual liquidation in

---

[5] No party argued that recision of revocation must await a changed circumstances review. *See* 19 U.S.C. § 1675(b) (1988).

[6] 19 U.S.C. § 1516a(e) provides:

(e) *Liquidation in accordance with final decision:*
    If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit—
        (1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and
        (2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section, shall be liquidated in accordance with the final court decision in this action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.

19 U.S.C. § 1516a(e) (1988).

accordance with an appealed CIT decision, because such a decision is not final under § 1516a(e). *See also Melamine Chems. Inc. v. United States,* 732 F.2d 924, 934 (Fed. Cir. 1984) (finding that except for 19 U.S.C. § 1516a(c) injunction, interlocutory CIT order has no effect on liquidation).

The court finds Commerce's argument of little import. Whether or not liquidation of entries at issue in *Zenith II,* should occur is not the issue before this court. What is before this court is a revocation decision. Previously, when Commerce has perceived reasons to question its revocation determination, it has asked for and received a remand. *See Timken Co. v. United States,* 7 CIT 319 (1984). Moreover, Capetronic has not participated in this action by filing a brief opposing Zenith's request for recision.[7] Commerce, upon being prodded by the court to reach a decision on the merits of recision, has now stated that the original margin was correct and that it intends to appeal in *Zenith II.* As Capetronic is no longer a Taiwanese CTV producer, there would be little practical purpose served by reversing the revocation decision prior to a ruling by the Court of Appeals. This issue is therefore reserved. Remand shall proceed on the other issues decided herein.

CONCLUSION

This action is remanded for recalculation of the VAT adjustment. Remand results are due in 45 days.

---

[7] In response to a letter to the parties asking specific questions concerning the Capetronic issue, Capetronic did raise opposition to Zenith's request for recision. *See* Comments of Capetronic (BSR) Ltd. Concerning the court's Letter of Sept. 30, 1994, at 3–5. Such opposition is untimely and is not considered by the court.